**William G. FULMER, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

Civ. A. No. 62–50.

United States District Court
D. Nebraska, Lincoln Division.
May 19, 1955.

Joseph Ginsburg, Lincoln, Neb. (Ginsburg & Ginsburg, Lincoln, Neb.), for plaintiff.

Donald R. Ross, U. S. Atty., and Harry W. Shackelford, Asst. U. S. Atty., both of Omaha, Neb., and Charles Thone, Asst. U. S. Atty., Lincoln, Neb., for defendant.

DELEHANT, District Judge.

Plaintiff, a veteran of the second world war, instituted this action against the defendant within the jurisdictional grant of Title 28 U.S.C. § 1346(b) and under the Federal Tort Claims Act. He demanded judgment for a substantial sum because of personal injuries by him allegedly received as the proximate result of negligence by employees of Veterans' Administration in the operation of a motor propelled ambulance in which as a patient plaintiff was being transported. He alleges that while he was being removed from a Lincoln, Nebraska, private hospital to Veterans' Administration hospital, near Lincoln, in a motor ambulance owned by the defendant and operated as an incident to the Administration hospital, for admission to and treatment in the Administration hospital, the operators of the ambulance were guilty of negligence in particulars as summarized in footnote,[1] and that, as a proxi-

---

1. Abbreviated reflection of plaintiff's specifications of defendant's negligence: (a) driving at a rate of speed greater than was careful and prudent in the existing circumstances; (b) failure to maintain proper control of ambulance; (c)

mate result, the plaintiff was thrown with great violence against the front of the ambulance and sustained thereby a broken neck.

The defendant admitted the residence and citizenship of plaintiff; that at the time complained of it maintained the Veterans' Administration hospital at Lincoln and owned an ambulance in which plaintiff was being moved from another Lincoln hospital to Veterans' Administration hospital; that certain traffic ordinances alleged in the complaint were in effect in Lincoln and denied the other allegations of the complaint. The answer also contained a paragraph wherein the defendant asserted that "if the plaintiff suffered injuries and damages as set out in said complaint same were approximately (sic) caused and contributed to by his own careless and negligent acts of omission and commission, or by the careless and negligent acts of omission and commission of persons other than employees of the United States of America". Ordered, as a part of the pretrial conference, to plead specifically any such acts or omissions on which it would rely in the trial, defendant by an amendment to its answer attributed the plaintiff's alleged injuries not to the ambulance trip set out in the complaint but rather to an automobile upset which had occurred nearly four days theretofore and to negligence either

of the plaintiff or of a brother of the plaintiff also involved in the upset (vide infra) depending upon which of its occupants was driving the upset vehicle. The answer also set up special defenses which will be given appropriate attention herein but need not be mentioned yet.

Trial was had to the court without a jury and exhaustive and helpful typewritten briefs have been submitted by counsel. The case is ready for final decision. The facts as found by the court will first be stated.

William G. Fulmer, now forty-seven years of age, is a veteran of the second world war and unmarried. On June 23, 1950, at about 4:30 p. m., he was operating as the driver a Dodge automobile, whose ownership is not shown and is immaterial, on U. S. highway 77 just south of Lincoln. By reason of a cause or causes which are not material,[2] he lost control of the vehicle which proceeded to the east side of the highway and was upset on its left side in the roadside ditch and against an embankment upon which was an access roadway to a dairy service station. Riding with him at the time was his brother, Howard Fulmer. When the Dodge automobile came to rest, Howard Fulmer had been thrown over and atop plaintiff who as driver was at the left or bottom side of the wrecked vehicle. The automobile was demolished. Workmen at the dairy both went to

---

failure securely to fasten and clamp down the patient's cot or litter; (d) failure to secure or fasten plaintiff's person to cot or litter; (e) failure to guard plaintiff from being thrown or jolted about during transportation; (f) failure to protect plaintiff from sudden movement, or stoppage of the ambulance or from jolting, and in that situation driving rapidly through congested traffic and suddenly stopping the ambulance; (g) the argumentative repetition of specification (a), supra; (h) entering a posted and favored street at an intersection without stopping or attempting to observe the condition of traffic approaching on the favored street; (i) a variation of the last preceding specification; (j) failure to yield right of way at the foregoing intersection to vehicles approaching on the favored street in vio-

lation of pleaded municipal traffic ordinances; (k) violation of further municipal ordinance in stopping the ambulance in a careless manner after entering the intersection.

The court is fully aware of the far more particularized and, in several instances, argued, averment of some of the foregoing specifications, and in appraising the charges, has regard to plaintiff's manner of their making, not to this index of them.

2. Defendant attributes the cause, to some extent at least, to drunkenness on the plaintiff's part, and there is some evidence from which it may be inferred that he had consumed liquor. But the cause of the June 23, 1950, upset is of no direct concern here. What matters here is not its cause but rather its results to plaintiff.

the assistance of the occupants of the wrecked car and by telephone called state patrol officers and the operators of an ambulance[3] who arrived promptly at the site of the upset.

Howard Fulmer, much the smaller of the two occupants of the overturned car, was first removed from the wreck by lifting him upward and out of the right or top door.

The plaintiff, the larger of the two men, just short of six feet in height and weighing about 185 pounds, was in such position that his removal from the wreckage was difficult. The steering wheel and rod of the car had been propelled forward, and plaintiff's body was bent entirely forward and downward and twisted around the steering rod near its lower part. His legs and hips were clearly injured and his head and shoulders were bent forward and downward beneath the instrument board and practically to the floor boards. One of his arms, extending upwards, was pinned between the steering rod and the front window, which the men who came to his aid broke in order to release the arm. He was also in profound shock and either wholly or partly unconscious and was bleeding profusely, partly from his head and face. Several men worked rapidly with the plaintiff and extricated him from the car.

Both plaintiff and Howard Fulmer were taken to St. Elizabeth's Hospital in Lincoln, the plaintiff by ambulance. He was admitted to that hospital at 5:30 p. m. on June 23, 1950. Howard Fulmer died there on the next day in consequence of his injuries. In the brief period of his stay at St. Elizabeth's Hospital (vide infra), plaintiff was not subjected either to a thorough and adequate diagnosis or to a program of long range corrective treatment. That circumstance reflects no discredit upon the hospital or upon his attending physician. He had arrived in a state of shock that forbade rugged or exhaustive procedures either of diagnosis or of treatment. And he left very early.

The court puts aside for the present the identification of the injuries with which, in consequence of the upset of June 23, 1950, plaintiff was brought to St. Elizabeth's Hospital. They may be more pointedly recorded after the narration of his further experience.

Early after his injury on June 23, 1950, a request was made, not by, but in behalf of, plaintiff for his admission to and treatment in the Veterans' Administration hospital near Lincoln. The request was considered and granted quite promptly. And on June 27, 1950, at 9:25 a. m., he was removed from St. Elizabeth's Hospital to Veterans' Administration hospital. Throughout the time involved in that removal the weather was clear and bright and the streets were dry.

The removal was effected by the use of a motor drawn ambulance owned by the defendant through Veterans' Administration and assigned for use incident to the operation of its hospital near Lincoln.

The ambulance is a regular commercial type ambulance made and marketed by Packard Automobile Company. Its body is divided between a driver's cab or space and the patient's compartment. The driver's cab is separated from the patient's compartment. The floor dimensions of the latter are 102 inches from front to rear and 57 inches in width. That floor is level and is occupied in important part by the patient's cot or litter and the attendant's seat. The litter or cot is 6 feet, 3 inches long and 20 inches wide. Its frame is of tubular steel construction with a supporting spring mat fastened to the frame. The tubular frame goes entirely around the litter. The head section is rounded. Upon the spring mat section is located a three inch thick foam rubber mattress which is 18 inches wide, and 72 inches long, and an ordinary head pillow and bed clothes such as sheets. In position the frame is 15 inches above the floor and the top of the mattress 18 inches above the floor. The litter or cot stands on four metal

---

3. Not the one discussed in the pleadings.

posts, each of which has a wheel footing. In use the litter or cot is fastened securely against the left side (facing forward) of the interior wall of the patient's compartment. Each of its two left posts is tightly engaged in a heavy metal clamp which, once affixed, can not be opened except by manual release or unlocking. On the cot the patient lies head forward. Forming a part of the partition wall between the driver's cab and the patient's space is a so-called bulk head in which are supply cabinets of thin metal which, closed, form a part of the bulk head partition. With the litter in place and fastened, there is an interval of 13½ inches between the patient's head and the nearest point of the partition or bulk head. Once in place and until manually released it is impossible for the patient's litter to move at all, either forward or backward or laterally. The attendant's chair is locked to the floor near the right side (looking forward) of the patient's position in the ambulance, and approximately beside the patient's left shoulder. That chair is removable, but during the ambulance's operation it is locked in its place on the floor. From the foot of the litter in position to the rear door, there is a distance of 6½ inches. The motive power for the ambulance is supplied by a Packard gasoline automobile engine. The ambulance is fully equipped with brakes which on June 27, 1950, were in proper adjustment and working condition. It was also equipped with a warning siren common to ambulances and with a red flasher light at its front left side.

The ambulance was brought to St. Elizabeth's Hospital and was operated by two experienced men, both regular employees of Veterans' Administration. These were Howard B. Parker, the chauffeur-driver, then about sixty years old whose regular job was that of chauffeur and who was assigned to the duty of operating or driving the ambulance; and Ray M. Tschantz, then about fifty years

old, and for some five years an attendant in the employ of Veterans' Administration hospital. They brought the ambulance to the St. Elizabeth's Hospital ambulance entrance, where they left it briefly, and took the litter into the hospital to get plaintiff.

On arriving at plaintiff's hospital room, Parker and Tschantz were informed that plaintiff was in serious condition and must be handled carefully. They obtained the assistance of employees of St. Elizabeth's Hospital, placed plaintiff carefully on the litter, to which, however, they did not strap or otherwise fasten him, and transported the litter bearing plaintiff, by rolling it upon floors, by elevator and by manual carriage, to the ambulance. They then placed the litter in its position at the left side of the patient's compartment of the ambulance with each of its left legs firmly engaged in its proper clamp duly locked. Plaintiff's head as he lay on the litter was towards the front, rather than the rear, of the ambulance. And Tschantz, once the litter and the plaintiff on it were fixed in place, sat down upon the attendant's chair fixed in its position upon the floor of the ambulance. The rear door was then closed.

Parker took his position in the driver's cab, started the engine of the ambulance and put the vehicle in motion. He proceeded to South Street which runs from west to east on the north side of St. Elizabeth's Hospital, and, on South Street proceeded east towards its intersection with 27th Street.[4] That segment of South Street is slightly and gently rolling, not exactly level yet not steep anywhere. Parker drove along that interval carefully and slowly, at a rate not more at any time than 18 or 20 miles per hour, and with his vehicle under proper control.

On reaching Sheridan Boulevard, slightly more than 200 feet west of the intersection of 27th and South Streets, Parker stepped on the ambulance's siren button,

4. The route followed was a direct and well improved highway between the two hospitals. 27th Street in some sixteen blocks east on South Street from St. Elizabeth's Hospital.

by which the warning siren was made to sound continuously and a red flashing signal on the left front fender was activated. These signs were kept in service until the ambulance was brought to a stop. With the siren and flasher sign in operation Parker gradually reduced the speed of the ambulance until with the vehicle under his full and proper control he was proceeding at about four miles per hour as he arrived at the west edge of 27th Street.

In Lincoln 27th Street is, and on June 27, 1950, was, an arterial street for a substantial interval including South Street and streets northerly and southerly from it. At an appropriate point before South Street's intersection with it, and on the south side of South Street is and then was a stop sign placed there by municipal authority. At the intersection each of the two streets was and is 30 feet wide. The intersection had and has an asphalt surface. Approaching from the west, South Street was and is of brick construction and had and has a slight down grade, over one per-cent, to the east.

On June 27, 1950, there were in force in the city of Lincoln the several sections of traffic ordinance pleaded by the plaintiff of which the court is aware in their entirety, but only the following will now be copied:

"701(g) *Stop Streets.* Any vehicle entering or crossing any street at which a stop sign has been erected shall come to a complete stop at such sign and outside such street and before entering such street, and regardless of direction, shall yield the right of way to vehicles and pedestrians upon said street to be entered or crossed." and

"719. It shall be unlawful for the driver of any vehicle to drive, use, operate, park or stop such vehicle in a careless manner, or in a reckless manner, or in a negligent manner, or in such manner as to endanger life, limb, person or property." [5]

Although the ambulance approached and reached the west edge of the intersection of 27th and South Streets while moving at approximately four miles per hour, it was not brought to a complete stop at the stop sign or outside 27th Street. On reaching the intersection Parker shifted his gears until they were disengaged and at the same time looked both to the right and to the left and saw no traffic which he then thought calculated to interfere with his immediate crossing of the intersection. Under the influence of his siren, cars had stopped and were standing both north and south of the intersection. He then completed his gear shift and accelerated his speed until he had reached a velocity of eight to ten miles per hour and was well into the intersection, when, looking to his left, he saw a southbound automobile pass a standing car and disclose its driver's purpose to proceed without stopping south across the intersection. Parker at once made an emergency brake application and came to a quick stop, "killing his engine" in the operation. The southbound automobile, meanwhile, had proceeded into the intersection and, to avoid collision, turned sharply to the east and stopped along the south curb of South Street East of 27th Street. Thus standing stopped in the intersection, Parker promptly started his engine and drove the ambulance at about six miles per hour through the remainder of the intersection and to the south side of South Street. The two vehicles did not collide at all and missed each other by a margin of from eight to 12 inches.

Having stopped at that point, Parker left his driver's cab and went to the rear of the ambulance, and opened its back door and entered the patient's compartment. He and Tschantz, with the aid of the driver of the southbound automobile, rearranged and realigned the plaintiff upon the litter. The plaintiff by reason

---

**5.** In this quotation the court follows paragraph 7(k) of the complaint, and paragraph 5 of the answer.

of the quick stop of the ambulance in the intersection had been moved forward upon the litter and mattress a distance not less than three inches and not more than ten or 12 inches. The evidence supports those limits and the court is convinced that the movement was about six or eight inches. Neither his head nor any other part of his body had struck or even touched the front bulk head of the ambulance's patient's compartment. The litter remained firmly in place and unmoved throughout the incident. And it was not removed from the ambulance or from its fastening clamps incident to the plaintiff's rearrangement on it, or at any time while the ambulance was at or in the vicinity of 27th and South Streets.[6]

The foregoing incident being completed, Tschantz resumed his chair and Parker closed the rear door of the ambulance and drove on to the Veterans' Administration hospital without incident. There plaintiff was taken into the hospital where he was entered as a patient. He remained a patient at that hospital for several months and some time after his discharge returned for a reexamination and recheck which involved a considerable but much shorter stay.

■ Upon the whole evidence, the court finds that in the automobile upset of June 23, 1950, plaintiff sustained fractures of the shaft of his right femur, and of his pelvis, and of two ribs on his right side and of three ribs on his left side, as well as many cuts and abrasions on his face, head and legs. Upon admittedly disputed testimony, it is specifically found that he also sustained then, and as the proximate consequence of that upset, a fracture of his neck, particularly of his fifth cervical vertebra with some not exactly determinable damage to the sixth cervical vertebra, from which he encountered some nerve impairment including disturbances in the sensory and motor capacity of certain of his fingers. At this point the finding is directly made that he sustained no personal injury at all as a proximate result of the stopping at 27th and South Streets or other movement of the ambulance on June 27, 1950.

The writer hereof is fully aware of the testimony of the physician who examined and treated plaintiff at St. Elizabeth's Hospital. He endeavored to repel the conclusion that any neck fracture or injury had occurred on June 23, 1950. It is true that an X-Ray disclosure of a vertebral fracture in the cervical segment of the spine was not made until after the trip of June 27, 1950. But no X-Ray examination was made of the plaintiff's head or neck or chest at St. Elizabeth's Hospital. His state of shock may well have deterred his examiners from making such an irritating study. However, his right leg was examined there Roentgenologically. And many things persuade the court that he had his neck involvement while he was at that hospital. The acknowledged violence of the trauma to him from the June 23, 1950, upset; the location and posture of his chest, neck and head as he lay helpless in the ruined vehicle; the cut and bloody condition of his head and face immediately after the misadventure, all point in some measure to that incident as the cause of just such an injury. Then the clinical record of the plaintiff at St. Elizabeth's Hospital offers some at least remotely supporting data. The same physician who testified in his behalf noted in the record of his examination made "three hours after accident" that plaintiff had "chest and head" injuries; that his "Head & neck" were "bruised" and his "chest" was "bruised". The "reactions and remarks" notations include a statement on the day of admission that he had "many lacerations about face"; another that those lacerations were sutured at 8:15 p. m. of that day; several references on the following day to severe back pains and one to labored respiration, both of which may perhaps be attributed to his rib

6. Upon this point the court rejects as disproved and untrue a statement by the sister of plaintiff as a witness that she saw the litter outside and near the rear of the ambulance during the stop at 27th and South Streets. It is satisfactorily shown that its removal simply did not occur.

fractures, but in relation to respiratory difficulty may also be traced to nerve involvement arising from injury to a cervical vertebra; and a notation of the application of ice caps to his head. The record shows the persistence of the back pain throughout the short period of his stay. Among other injuries noted on his progress record are "multiple lacerations over body" "Fracture nose" "possible fr. ribs" and "possible spine fracture in lumbo-dorsal area" and "evidence of chest injury". It is recognized that several of those notations deal directly with regions of his body somewhat remote from the neck. But in search for the consequences of an upset of that severity they are not wholly irrelevant. It has also to be noted that even upon his initial admission to Veterans' Administration hospital, the record of his history of his complaints following the June 23, 1950, accident discloses that he reported, "He has continued to have pain in his right thigh & the entire low back. *He has had partial numbness of both hands, especially the ulnar borders*". (Emphasis added.) Some significance may be attributed to that declaration since the medical testimony appears quite clearly to trace numbness of that nature to traumatic injury of the cervical spine.

By contrast the incident on June 27, 1950, at 27th and South Streets was of minor significance and free of violence to plaintiff's person. The testimony of Tschantz who saw plaintiff throughout the occurrence is direct and convincing in negation of any movement or contact whereby the plaintiff may reasonably be considered then to have encountered further injury. Parker's evidence respecting the plaintiff's placement in the ambulance, his operation of the ambulance, in relation to which he frankly acknowledges his failure completely to stop before entering the intersection, and his observations and dealing with the plaintiff thereafter are also deserving of credence. In some details those witnesses are corroborated by other and more disinterested testimony. Plaintiff, as a witness, as well as in his pleading, cast a considerable measure of doubt upon his own credibility by his insistence that Parker and Tschantz transported him in the ambulance upon a litter that was unattached to the side of the vehicle. By all other accounts in the evidence, as well as from personal observation, it is manifest that a wheel borne litter thus unattached would inevitably roll and shift aimlessly about the entire patient's section of the ambulance and would be uncontrollable by an attendant. The court is satisfied that upon that subject the plaintiff knowingly testified falsely. And while that conviction has not prompted the court to disregard his other testimony, it does inevitably impair the probative significance of such testimony in areas of dispute.

As a factual finding the court announces its determination that the defendant, by and through its employee, Parker, was negligent in failing to bring the ambulance to a complete stop at the intersection stop sign and while the ambulance was still outside 27th Street and had not yet entered it, and in failing to yield the right of way to vehicles then upon that street especially the southbound car with which he so narrowly avoided collision. That finding is based upon the court's conviction that he failed to exercise that degree of care which a proper regard for his safety and the safety of others required in the circumstances. Among the circumstances are the favored character of 27th Street, the presence of the warning stop sign, the probability of through driving from north and south over the intersection, the admittedly injured and delicate condition of the plaintiff who was in the driver's charge, and the sluggishness, and lack of control with which he might reasonably have expected to operate the ambulance 'from its entry into the intersection at about four miles per hour.[7] In reaching

---

7. In illustration of which his power failed when he applied the brakes although by then he was going more than twice as rapidly as when he crossed the west margin of the intersection.

this conclusion that negligence was committed the violation of the municipal ordinance in failing to stop has been regarded not as negligence per se, but as evidence to be considered along with the other evidence in determining the existence of negligence. Such is Nebraska's settled position upon that issue. It is also found that the defendant was not otherwise negligent in any of the respects or particulars·alleged in the complaint.

But, as has already been made clear, it is further found that the negligence found to have occurred was not the proximate cause of any injury or damage whatsoever to the plaintiff, particularly of the injury or damage, by him complained of in his pleadings.

Finally, while it can not affect the judgment which must necessarily be made and given upon the foregoing findings, notation must be made that if a judgment in the plaintiff's favor were allowable under the facts, the record before the court would only partially and narrowly support an award in respect of the elements of damage asserted. It is true that plaintiff's undergoing of much pain and suffering may be inferred, but how far, if at all, such pain and suffering were increased over what would inevitably have followed the injury of June 23, 1950, seems not to have been disclosed. Expense for hospital, surgical, medical, X-Ray, and nursing treatment, both past and prospective, is alleged, but not proved. Evidently the past expense has been borne by the defendant through Veterans' Administration, not because of any tort liability but on the score of plaintiff's status as a veteran. And for the future the proof is simply inadequate. Impairment of earning capacity is pleaded but inadequately proved. There is, indeed, some evidence of plaintiff's incapacity now for regular work. But the court is provided with no showing of his earning capacity before the injury to him or in satisfactory terms of his post injury earning capacity. And again, no segregation is made of impairment attributable to each of the two alleged injuries. And that would be important if

a judgment could be entered for plaintiff, for by any possible test, he was a badly injured man by the evening of June 23, 1950, and before Veterans' Administration sent its ambulance to get him. If he had proved that he was still further injured in proximate consequence of negligence by Veterans' Administration, he would have been under the necessity of showing in what measure, if any, that further injury impaired his earning capacity. The gap noted in the proof becomes immaterial. If the findings had been otherwise it might not have been.

Under the Federal Tort Claims Act, as the parties agree, the law of Nebraska respecting liability and the measure of recovery is controlling. That comes about, not because of Title 28 U.S. C. § 1652, and Erie Railroad Company v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, but rather because of the express statutory reference to state law as the test of liability. Title 28 U.S.C. § 1346(b).

.It is also agreed upon that under Nebraska's law the burden rests upon the plaintiff in an action based upon alleged negligence to prove by a preponderance of the evidence before he may recover, each essential element of the claim which he asserts. This includes, among other things, the burden of proving the existence of negligence in one or more of the respects alleged and that the negligence charged was the proximate cause of the injury alleged. Sippel v. Missouri Pacific Railway Co., 102 Neb..597, 168 N.W. 356; Lyman v. Hall, 117 Neb. 140, 219 N.W. 902; Broadston v. Beddeo Clothing Co., 104 Neb. 604, 178 N.W. 190; Bowerman v. Greenberg, 142 Neb. 721, 7 N.W. 2d 711.

The defendant has pressed upon the court several· special defenses to the plaintiff's claim, none of which is believed to have merit. However, they should be considered briefly.

The defendant's assertion in paragraph 7 of its answer that if the plaintiff suffered injuries and damages as set out in his complaint they were proximately

caused and contributed to by his own careless and negligent acts of omission and commission or by the careless and negligent acts of omission and commission of persons other than the defendant's employees was properly understood by the court as a plea of contributory negligence or of the negligence of a third party. The direct averment was conditioned that "the plaintiff suffered injuries and damages as set out in his complaint". But when forced by the pretrial order of the court to specify the negligence aimed at, the defendant in its amendment eliminated any question of contributory negligence or a third party's negligence incident to any injuries sustained on June 27, 1950, and disclosed that what it had somewhat aimlessly tried to do was to assert that whatever injuries the plaintiff labored under had been sustained by him on June 23, 1950, in the upset which was caused by the negligence of the driver of the upset vehicle. That is not an affirmative defense. It sets up nothing whose proof would be unsupported by a general denial. Styskal v. Brickey, 158 Neb. 208, 62 N.W.2d 854; Harding v. Hoffman, 158 Neb. 86, 62 N.W.2d 333; Umberger v. Sankey, 151 Neb. 488, 38 N.W.2d 21. It is hardly more than an argument against plaintiff upon the issue of proximate cause.

By another amendment to its answer, defendant asserted that plaintiff on June 27, 1950, was a guest riding by invitation and not for hire in the ambulance and the driver of the ambulance was not under the influence of intoxicating liquor or guilty of gross negligence in operating the ambulance, and that by reason of Section 39–740, R.S.Neb.1943, no liability in favor of plaintiff existed. Upon this question there is no evidence that Parker was under the influence of intoxicating liquor; and the court unhesitatingly finds that he was not guilty of gross negligence in operating the ambulance. But the defendant is not absolved from liability on account of Section 39–740, R.S.Neb.1943. The plaintiff was being transported not as a nonpaying guest, or as a guest at all. He was rather being transported, even as he was subsequently treated in Veterans' Administration hospital, as a world war veteran and in consideration of his determined and earned right (as the law and regulations stood) to hospitalization. Section 39–740, R.S.Neb.1943, simply has no present application.

The defendant has consistently urged that in the circumstances of the case plaintiff has no right to proceed, and this court is without jurisdiction, under Federal Tort Claims Act, upon the ground that plaintiff's exclusive remedy is under Title 38 U.S.C.A. § 501a. While several opinions of inferior federal courts have been discussed in the briefs, certain Supreme Court opinions are more nearly instructive upon the point, even though not all of them are directly concerned with the question.

Title 38 U.S.C.A. § 501a follows:

"Where any veteran suffers or has suffered an injury, or an aggravation of any existing injury, as the result of hospitalization or medical or surgical treatment, awarded him under any of the laws granting monetary or other benefits to World War veterans, or as the result of having submitted to examination under authority of the War Risk Insurance Act or this chapter, and not the result of his misconduct, and such injury or aggravation results in additional disability to or the death of such veteran, the benefits of sections 471a, 473a, 701, 702, 703, 704, 705, 706, 707–710, 712–715, 717, 718, 720, and 721 of this title shall be awarded in the same manner as if such disability, aggravation, or death were service connected within the meaning of such laws; except that no benefits under this section shall be awarded unless application be made therefor within two years after such injury or aggravation was suffered, or such death occurred, or after March 28, 1934, whichever is the later date. The benefits of this section shall be in lieu of the bene-

fits under the Federal Employees Compensation Act."

Feres v. United States, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152, absolved the United States from liability under Federal Tort Claims Act for injuries to members of the armed forces sustained while on active duty and not on furlough, resulting from the negligence of others in the armed forces. It explained that no analogous liability of a "private individual" growing out of "like circumstances" may be found when the relationship of the tort feasors and their victims is regarded. And it took into consideration the comprehensive system of relief provided by the United States for members of its armed services and their dependents. In Johansen v. United States, 343 U.S. 427, 72 S.Ct. 849, 96 L.Ed. 1051, the court considered libels in admiralty against the government brought under Public Vessels Act, 46 U.S.C.A. § 781 et seq., by a civilian employee of United States as a member of the crew of a "public vessel", not a "merchant vessel" of United States and by the personal representative of a deceased civilian employee also a member of the crew of a "public vessel", of whom the former was injured and the latter killed through negligence of United States or unseaworthiness of the vessel. It held that Federal Employees Compensation Act, 5 U.S.C.A. § 751 et seq., was applicable in each case and its benefits exclusive. The reasoning is not unlike that which prompts states to make benefits under workmen's compensation acts the exclusive measure of recovery against employers for injuries to or deaths of employees in industrial accidents.

Brooks v. United States, 337 U.S. 49, 69 S.Ct. 918, 93 L.Ed. 1200, allowed recovery under Federal Tort Claims Act for the death of one and the injury of another member of the armed forces resulting from the negligence of a civilian employee of the government driving an army truck but under circumstances in which the wrongs did not result as an incident to the service of the persons harmed. It was suggested that in arriving at judgment under the Tort Claims Act it might be appropriate to deduct or take into consideration any amounts payable under servicemen's benefit laws.

Much more nearly in point than any of the other three cases, as this court thinks, is the recent ruling in United States v. Brown, 348 U.S. 110, 75 S.Ct. 141, 142. In it the Supreme Court followed Brooks v. United States, supra, and distinguished Feres v. United States, supra. It allowed the maintenance of an action under Federal Tort Claims Act for an injury suffered by a discharged veteran after his discharge, in a Veterans' Administration hospital as a result of negligent treatment of a service-connected disability, although his compensation under the Veterans' Act had already been increased because of such injury. Reasoning to its conclusion the court, speaking through Mr. Justice Douglas, said:

"The Veterans Act, 48 Stat. 526, 38 U.S.C. § 501a, 38 U.S.C.A. § 501a, allows compensation both where the veteran suffers injury during hospitalization and where an existing injury is aggravated during the treatment. Each is considered as though it were 'service connected'. Respondent received a compensation award for his knee injury when he was honorably discharged; and that award was increased after the 1951 operation.

"The District Court agreed with the contention of petitioner that respondent's sole relief was under the Veterans Act and dismissed his complaint under the Tort Claims Act. The Court of Appeals reversed. 2 Cir., 209 F.2d 463. The case is here on a petition for certiorari which we granted, 347 U.S. 951, 74 S.Ct. 680, 98 L.Ed. 1097, because of doubts as to whether Brooks v. United States, 337 U.S. 49, 69 S.Ct. 918, 93 L.Ed. 1200, or Feres v. United States, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152, controlled this case.

"The Brooks case held that servicemen were covered by the Tort

Claims Act where the injury was not incident to or caused by their military service. 337 U.S. 49, 52, 69 S. Ct. 918, 920. In that case, servicemen on leave were negligently injured on a public highway by a government employee driving a truck of the United States. The fact that compensation was sought and paid under the Veterans Act was held not to bar recovery under the Tort Claims Act. We refused to 'pronounce a doctrine of election of remedies, when Congress has not done so.' Id., 337 U.S. at page 53, 69 S. Ct. at page 920.

"The Feres decision involved three cases, in each of which the injury, for which compensation was sought under the Tort Claims Act, occurred while the serviceman was on active duty and not on furlough; and the negligence alleged in each case was on the part of other members of the Armed Forces. The Feres decision did not disapprove of the Brooks case. It merely distinguished it, holding that the Tort Claims Act does not cover 'injuries to servicemen where the injuries arise out of or are in the course of activity incident to service.' 340 U.S. 135, 146, 71 S.Ct. 153, 159. The peculiar and special relationship of the soldier to his superiors, the effects of the maintenance of such suits on discipline, and the extreme results that might obtain if suits under the Tort Claims Act were allowed for negligent orders given or negligent acts committed in the course of military duty, led the Court to read that Act as excluding claims of that character. Id., 340 U.S. at pages 141–143, 71 S.Ct. at pages 156–157.

"The present case is, in our view, governed by Brooks, not by Feres. The injury for which suit was brought was not incurred while respondent was on active duty or subject to military discipline. The injury occurred after his discharge, while he enjoyed a civilian status.

The damages resulted from a defective tourniquet applied in a veterans' hospital. Respondent was there, of course, because he had been in the service and because he had received an injury in the service. And the causal relation of the injury to the service was sufficient to bring the claim under the Veterans Act. But, unlike the claims in the Feres case, this one is not foreign to the broad pattern of liability which the United States undertook by the Tort Claims Act.

"That Act provides that, 'The United States shall be liable * * * in the same manner and to the same extent as a private individual under like circumstances * * *.' 28 U.S.C. § 2674, 28 U.S.C.A. § 2674. The Feres case emphasized how sharp would be the break in tradition if the claims there asserted were allowed against the United States, the Court noting that the effect of the Tort Claims Act is 'to waive immunity from recognized causes of action', 'not to visit the Government with novel and unprecedented liabilities.' 340 U.S. 135, 142, 71 S.Ct. 153, 157. But that cannot be said here. Certainly this claim is one which might be cognizable under local law, if the defendant were a private party. Responsibility of hospitals to patients for negligence may not be as notorious as the liability of the owners of automobiles. But the doctrine is not novel or without support. See, for example, Sheehan v. North Country Community Hospital, 273 N.Y. 163, 7 N.E.2d 28, 109 A.L.R. 1197, and the cases collected in 25 A.L.R.2d 29.

"Congress could, of course, make the compensation system the exclusive remedy. The Court held in Johansen v. United States, 343 U.S. 427, 72 S.Ct. 849, 96 L.Ed. 1051, that Congress had done so in the case of the Federal Employees Compensation Act, 5 U.S.C.A. § 751 et seq., with the result that a civilian em-

ployee could not sue the United States under the Public Vessels Act, 46 U.S.C.A. § 781 et seq. We noted in the Brooks case, 337 U.S. 49, 53, 69 S.Ct. 918, 920, that the usual workmen's compensation statute was in this respect different from those governing veterans, that Congress had given no indication that it made the right to compensation the veteran's exclusive remedy, that the receipt of disability payments under the Veterans Act was not an election of remedies and did not preclude recovery under the Tort Claims Act but only reduced the amount of any judgment under the latter Act. We adhere to that result. We adhere also to the line drawn in the Feres case between injuries that did and injuries that did not arise out of or in the course of military duty. Since the negligent act giving rise to the injury in the present case was not incident to the military service, the Brooks case governs and the judgment must be affirmed."

It is difficult to distinguish United States v. Brown, supra, from this case, unless a distinction lies in the service-connected character of Brown's disability. And there seems to be no logical ground for that distinction. In Brown's case his service and service connected disability entitled him to the hospitalization. Plaintiff's right to such hospitalization appears to have been acknowledged.

■ The court, therefore, considers that Title 38 U.S.C.A. § 501a, supra, does not provide plaintiff with his exclusive remedy and oust the applicability of Federal Tort Claims Act or this court's jurisdiction.

■ In argument, the defendant takes the position that in its operation of its Veterans' Administration hospitals, it is analogous to a non-profit charitable corporation maintaining and operating a hospital for charitable or religious purposes. And pointing to Nebraska's rule exempting such a corporation from liability for the torts of its employees, agents or servants insofar as inmates, participants, or recipients of the charity are concerned, and to the condition, under Title 28 U.S.C. § 1346(b), that liability shall arise and jurisdiction of this court attach, "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred", it insists that both liability and jurisdiction fail. The position is completely without merit. In its statement it sounds fairer than it is.

Nebraska, to be sure, has long administered the rule exempting a non-profit charitable corporation from tort liability in favor of inmates, participants or recipients of the charity. The exemption, however, has not been extended to hospitals organized and operated for private profit. Malcolm v. Evangelical Lutheran Hospital Association, 107 Neb. 101, 185 N.W. 330; Wetzel v. Omaha Maternity & General Hospital Ass'n, 96 Neb. 636, 148 N.W. 582. Under vigorous assault the rule of exemption in favor of non-profit charitable corporations has very recently been examined and emphatically reaffirmed. Muller v. Nebraska Methodist Hospital, 160 Neb. 279, 70 N.W.2d 86; and Cheatham v. Bishop Clarkson Memorial Hospital, 160 Neb. 297, 70 N.W.2d 96. The state law upon the question is, therefore, firmly established now and for the discernible future.

But it may not avail the defendant. Neither in its constitutional erection nor in its operation of its Veterans' Administration hospitals is the United States a non-profit charitable corporation. And that fact matters considerably, for what is exempted from liability is not the business of hospitalization but the non-profit charitable corporation; and it is exempted precisely because it is a non-profit charitable corporation, not because it operates a hospital.

Several grounds are relied upon in reported decisions in support of the rule of exemption. These include (a) the trust fund theory, whereunder it is considered that the resources of the corporation are received for specific purposes personal

to the donors and held in trust and may not be diverted to purposes other than those of the trust; (b) the closely related theory of public policy, whereunder it is reasoned that since such corporations are inspired and supported by benevolence and devote their efforts and assets to the relief of the destitute sick and needy, the general welfare requires their encouragement and exemption from liability for tort, and a contrary policy would discourage the charitably inclined, dissipate and pervert the assets of the corporations and finally destroy them; (c) the fact that such corporations derive no profit in the sense of private gain from what their servants do, whereby in their case the principal reason underlying the rule of respondeat superior fails; (d) the theory of implied waiver under which one who accepts the benefits of such charity enters into a relationship which exempts his benefactor from liability for the negligence of its servants in administering the charity, if the benefactor has used due care in selecting such servants; and (e) the theory that such non-profit charitable corporations in operating hospitals are performing a public function and aiding in the performance of a public or quasi-public duty. See the exhaustive and lucid study of Justice Wenke in Muller v. Nebraska Methodist Hospital, 160 Neb. 279, 284, 285, 286, 287, 70 N.W.2d 86. Not one of those theories, nor all of them in combination, may be applied to the United States in any capacity, particularly in its operation of Veterans' Administration hospitals.

Defendant professes to derive comfort in its position now being considered from certain reported opinions in which a distinction has been drawn between the benefits accorded under War Risk insurance policies or certificates which are classified as contract rights and pensions and compensation allowances and privileges which are characterized as gratuities. And it argues that hospitalization in Veterans' Administration hospitals is within the latter area. Representative of such cases are White v. United States,

270 U.S. 175, 46 S.Ct. 274, 70 L.Ed. 530 and Lynch v. United States, 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434. But that distinction is beside the present point. Gratuities though such benefits be from an appreciative government, they are neither identical with nor analogous to the charitable care of an eleemosynary corporation's hospital. Veterans, it is true, may not claim a deprivation of property without just compensation if their availability be withdrawn by statute or regulation. But they have a right by virtue of their military service to claim them, so long as their availability legally persists. Somewhat instructive are Grigalauskas v. United States, D.C.Mass., 103 F.Supp. 543, and Perucki v. United States, D.C.Pa., 76 F.Supp. 34. In each, though of course in its own setting, the government's claim to exemption as a non-profit charitable corporation was advanced, examined and rejected. And defendant upon the present submission has not succeeded in its effort to explain away the rejection.

However, the defendant's unwarranted reliance upon ill conceived legal defenses, supra, is not alone a ground for judgment against it. The burden of proof of the essential elements of his case remains to plague plaintiff. And, as has already been declared, he has failed adequately to carry it. He has, it is true, established to the court's satisfaction the defendant's guilt of negligence through the operation of the ambulance at the intersection of 27th and South Streets. The negligence was not established by overwhelming evidence or in any high degree, but it was negligence nevertheless.

But there was in the court's considered opinion a fatal failure to prove by a preponderance of the evidence that such negligence was the proximate cause of any injury or damage of which the plaintiff claims, or even that he sustained any injury or damage whatsoever at the time of the commission of the negligence or in anywise in relation to it.

The plaintiff's plight in this litigation has been uninviting. In going forward with his proof he has necessarily had to

explain how he happened to be in defendant's ambulance. And that has brought forward the event of June 23, 1950, with its general and gross injury to the plaintiff. He did not arrive at 27th and South Streets as a healthy man in good physical condition. He was already seriously hurt. In such a situation he inevitably found it difficult to prove that a particular injury was inflicted upon him at the intersection. And this court is persuaded that he failed completely in the effort.

The result is that judgment must be entered in favor of the defendant and against the plaintiff and directing dismissal of the action and the plaintiff's complaint at plaintiff's cost. It is being made and given accordingly.