George H. PHILLIPS, Plaintiff,

v.

UNITED STATES of America and Billie C. Lear, Defendants and Third-Party Plaintiff (Virginia Transit Company, Third-Party Defendant).

Civ. A. No. 2802.

United States District Court
E. D. Virginia,
Norfolk Division.

March 28, 1960.

Gordon E. Campbell, Norfolk, Va., for plaintiff.

Jos. S. Bambacus, U. S. Atty., Richmond, Va., and W. Farley Powers, Jr., Asst. U. S. Atty., Norfolk, Va., for defendants and third-party plaintiff.

L. S. Parsons, Norfolk, Va., for third-party defendant.

Lewis T. Booker, Richmond, Va., for third-party defendant.

WALTER E. HOFFMAN, District Judge.

■ Plaintiff, a retired Chief Warrant Officer in the United States Navy, was injured on November 2, 1956, at approximately 11:00 P.M., while riding as a passenger in a Navy ambulance which was involved in a collision with a bus, owned and operated by the Virginia Transit Company, at the intersection of City Hall Avenue and Church Street, Norfolk, Virginia. He institutes this action against the United States under the Federal Tort Claims Act, 28 U.S.C. § 1346(b). The United States, seeking contribution between *joint tort-feasors* under Virginia law, has appropriately joined the Transit Company as a third-party defendant.

On the evening in question the plaintiff, suffering from pains in his chest, was taken by his wife to the dispensary at the Naval Air Station and, after identifying himself as one entitled to treatment by reason of his retired status, was given a brief examination by the medical officer-in-charge, who, in turn, recommended that plaintiff be hospitalized at the Naval Hospital in Portsmouth. Plaintiff was told that an ambulance carrying another patient, Hodges, was due to arrive shortly, and would be departing for the Naval Hospital thereafter. While plaintiff was clearly given an option to ride with his wife or in the ambulance, a fair conclusion from the evidence is that the medical officer suggested the ambulance as a means of conveyance.

When the ambulance arrived, driven by Lear and accompanied by hospital corpsman, DuVall, the condition of Hodges was likewise diagnosed as a heart ailment, and the medical officer instructed DuVall to take both Hodges and the plaintiff to the Portsmouth Naval Hospital, a distance estimated to be approximately ten miles. Lear was driving, plaintiff was on the front seat, and DuVall was in the rear of the ambulance with Hodges, the litter patient. It was Lear's first experience in driving an ambulance, and it is apparent that he received no prior instructions with respect to the operation of ambulances in general. The medical officer gave no instructions as to any emergency and, as he testified, emergency runs are rare occurrences. If it is an emergency the Naval authorities and City Police are notified in order that arrangements may be made to escort the ambulance. Manifestly, no emergency existed with respect to either Hodges or the plaintiff.

Regrettably ambulance drivers and hospital corpsmen generally assume that all ill patients are in emergency status. DuVall directed Lear to turn on the siren and blinker light. The ambulance, while proceeding east on City Hall Avenue, approached the intersection of Church Street which is controlled by a traffic light. Before reaching this intersection, however, there is a slight bend or curve in City Hall Avenue requiring a driver going east to swerve slightly to the right. This curve is approximately 200 feet west of the Church Street intersection. The weather was clear and the streets were dry. City Hall Avenue approaching Church Street is divided into six lanes; two of which are westbound; three of which are eastbound for through or right turn traffic; and one of which is eastbound for a left turn at Church Street. A Transit Company bus was stopped in the extreme right lane for eastbound traffic where a bus stop is located. Several automobiles were stopped in the next lane, and a police car was stopped in the third eastbound lane. The traffic light at Church Street for east and west traffic was red and, at about the time the light changed from green to red, the police officers heard a siren which they did not immediately identify as approaching from the rear, although they pulled the police car as close as possible to the vehicles in the second eastbound lane to permit the ambulance to pass in the left turn lane. The police officers then glanced to the rear and observed the blinker light of the ambulance coming around the bend of City Hall Avenue approximately 200 feet to their rear. The speed of the ambulance has been variously estimated at 20 to 45 miles per hour. A proper conclusion would be from 35 to 40 miles per hour, which was in a business zone where the speed limit is 25 miles per hour.

As the police officers heard the siren despite the fact that the windows in their car were closed, it is fair to assume that the weather was either chilly or cold. Immediately after seeing the approaching blinker light on the ambulance, the police officers looked ahead and observed a southbound Transit Company bus entering the intersection on Church Street. While the driver of this bus was not produced as a witness, evidence has been received to the effect that his whereabouts has been unknown since shortly after the accident, although the Transit

Company has diligently endeavored to locate him.

Two physicians were stopped at the traffic light headed west. They stated that the bus, headed south on Church Street, had already entered the intersection when they noted the blinker light on the ambulance rounding the bend on City Hall Avenue headed east. As indicated, the traffic light was green for the bus and red for the ambulance. Even the ambulance driver is uncertain as to the lights and, like most ambulance operators, he apparently assumed that he had the right of way.

Proceeding in violation of the traffic light, the ambulance entered the intersection and struck the bus at the right rear wheel, a distance of approximately eight feet from the rear of the bus. As City Hall Avenue is 56½ feet in width, the bus had traveled better than 50 feet across the intersection before being struck by the ambulance.

Section 27–72 of the Code of the City of Norfolk provides, in substance, that parties hearing an audible signal by siren or exhaust whistle "shall immediately drive * * * to a position at or near as possible and parallel to the right-hand edge or curb, clear of any intersection of highways, and shall stop and remain in such position unless otherwise directed by a police or traffic officer, until the police or fire department vehicle, or ambulance shall have passed." This ordinance further provides:

"This provision shall not operate to relieve the driver of a police or fire department vehicle or ambulance from the duty to drive with due regard for the safety of all persons using the highway, nor shall it protect the driver of any such vehicle from the consequences of an arbitrary exercise of such right of way."

It was not until 1956 that the General Assembly of Virginia gave authority to ambulances, operating under an emergency, to proceed past a red signal light, but the statute does not grant a right of way. Code of Virginia, 1950, as amended, § 46.1–226. Even then such exemp-

tions granted to ambulances are subject to certain conditions regarding insurance, etc., and it is further provided that "nothing in this section shall be construed to release the operator of any such vehicle from civil liability for failure to use reasonable care in such operation". In 1956, when this accident occurred, the only other exemption granted to ambulances was as to speed when traveling in emergencies. Code of Virginia, 1950, as amended, § 46–216. And the latter section contains this pertinent wording:

"This exemption shall not, however, protect the driver of any such vehicle from the consequences of a reckless disregard of the safety of others."

Section 27–72 of the Code of the City of Norfolk was adopted in 1953. It included ambulances on emergency calls (now permitted by § 46.1–225) but such an ordinance as to ambulances in 1953 or 1956 was in clear violation of § 46–200 of the Code of Virginia, 1950, in that it purported to grant a right of way. As stated in Virginia Transit Co. v. Tidd, 194 Va. 418, 73 S.E.2d 405, 408, decided in 1952:

"Thus in Virginia the drivers of police cars, ambulances, and other State, county and city-owned vehicles are subject to all traffic regulations *unless a specific exception is made.* Furthermore, § 46–200 of the Code provides that no city or town shall adopt any ordinances or traffic regulations in conflict with the provisions of chapter 4, title 46, of the Code."

It was to give some leniency to police, fire and ambulance vehicles that § 46.1–225 and § 46.1–226 were enacted in 1958 and 1956 respectively. The 1958 Act, § 46.1–225, does apparently grant a right of way to an ambulance operating under an emergency run. It is, therefore, clear that at the time of this accident the Navy ambulance, if on an emergency call, was governed by all of the traffic laws applicable to other vehicles, with the possible exception of the speed limitations exempting "county or municipal ambulances when traveling in emergencies,"

Code of Virginia, 1950, § 46–216, and the right to "proceed past red signal, light, stop sign or device indicating moving traffic shall stop if the speed and movement of the vehicle is reduced and controlled so that it can pass a signal, light or device with due regard to the safety of persons and property." Code of Virginia, 1950, as amended, § 46.1–226.

We have already pointed out that no emergency existed. Assuming arguendo that an emergency did exist, no *lawful* right of way had been granted to the ambulance. The negligence of the ambulance driver was gross and, in the opinion of the Court, constituted the sole proximate cause of the accident and resulting injury. He did not slow down, or attempt to slow down, when approaching the intersection, until he observed the bus in the intersection.

The United States argues that the Transit Company was guilty of some negligence contributing to the accident. We do not agree although, on the evidence adduced, it appears to be a factual question. True, the bus driver, even though armed with a command to proceed because of the green light, should not knowingly enter an intersection in the path of an approaching ambulance blowing a siren and flashing its blinker lights. A right of way does not permit one to disregard what may appear to be obvious, and does not relieve the party having such right of way of the duty of exercising due care. Johnson v. Harrison, 161 Va. 804, 172 S.E. 259. However, in this case it is unlikely that the bus driver either saw or heard the ambulance. The view to his right, from which direction the ambulance was approaching, was at least partially, if not entirely, blocked by a seven foot brick wall surrounding the property of St. Paul's Church, the corner of which runs nearly to the curb line. At the point where the bus driver presumably stopped to await the light change, he could only observe traffic for a distance of approximately 100 feet west on City Hall Avenue. There is no evidence of improper speed on the part of the bus, and all indications are that the

driver was unaware of the approaching ambulance. The bus, as noted, had substantially crossed the intersection when it was hit on the right rear wheel. Moreover, if the bus entered the intersection prior to its driver hearing or seeing the ambulance, it was incumbent on the bus driver to proceed through the intersection, rather than stop in same. We find that the bus driver was guilty of no negligence which was a proximate cause of the accident.

■ By reason of the finding of gross negligence on the part of the ambulance driver, it becomes unnecessary to consider the status of plaintiff as a "guest" as contended by the United States. We agree with the reasoning of Judge Delehant in Fulmer v. United States, D.C., 133 F.Supp. 775, 785, wherein he points out that, under the Nebraska statute, R.S.1943, § 39–740, which requires proof of gross negligence as does Virginia, the veteran being transported in an ambulance was not a "guest" as his transportation was in consideration of his determined and earned rights to hospitalization under the law and regulations applicable thereto. While the rights and benefits granted to a veteran may be withdrawn, as they are generally considered a gratuity, there is no suggestion that they have been withdrawn as applied to this plaintiff, and, therefore, he could not be considered a "guest" within the Virginia law. Aside from the contention of the Government, we doubt that the Virginia decisions would uphold the status of a passenger in an ambulance as a "guest", when the passenger is en route to a hospital for treatment.

■ The injuries sustained by plaintiff were serious and permanent. There is no evidence tending to show any aggravation of the cardiac condition, but, as a result of the accident, he suffered a severe hemorrhage from the left kidney. He was on the critical list for several days. While the left kidney was intact, it was poorly filled with dye. There is, at the present time, a permanent lesion of the upper portion of the kidney. Plaintiff has, and will in the future have,

a mild aching pain which is not constant and is non-disabling, and which is caused by scar tissue. He remained in the hosital until November 30, 1956, and was unable to resume work until January 15, 1957. He was, and still is, employed by the National Bank of Commerce at a salary of $250 per month and, while his salary was gratuitously paid by the Bank during his disability, he is, nevertheless, entitled to recover for loss of time under the principle announced in Rayfield v. Lawrence, 4 Cir., 253 F.2d 209.

A fair and just award to the plaintiff is fixed at $8,000. Counsel for the plaintiff will be awarded an attorney's fee of $1,600 to be paid from, but not in addition to, the aforesaid $8,000. If counsel for plaintiff has advanced non-recoverable costs by reason of this or other pending litigation arising out of this accident, such costs may be collected from plaintiff, in addition to the attorney's fee, by the filing of an affidavit setting forth the items of non-recoverable costs.

Let a judgment order be presented.