EDWIN LYMAN, ADMINISTRATOR, APPELLEE, V. WALTER B. HALL, APPELLANT.

FILED JUNE 8, 1928. No. 25874.

*Butler & James* and *J. F. Ratcliff*, for appellant.

*Scott & Scott, contra.*

Heard before GOSS, C. J., ROSE, GOOD, THOMPSON and HOWELL, JJ., and CLEMENTS and REDICK, District Judges.

ROSE, J.

This is an action against the proprietor and keeper of a public bathing pool to recover damages in the sum of $20,200 for alleged negligence resulting in the death of Richard A. Lyman. He was drowned in deep water while bathing in the pool. His father, Edwin Lyman, instituted the action as administrator of decedent's estate. Walter B. Hall is defendant, and the negligence imputed to him consists of his failure to give proper notice of the depth of water in different parts of the pool; to provide suitable

guards and directors; to provide competent persons to recover and resuscitate bathers when overcome by water.

Defendant in his answer admitted that he owned and operated the bathing pool and that plaintiff's son was drowned therein, but denied the negligence charged in the petition and pleaded contributory negligence of the son as the proximate cause of his death. The reply to the answer was a general denial.

Upon a trial of the issues the jury rendered a verdict in favor of plaintiff for $5,000, which was reduced by remittitur to $3,000. From a judgment for the latter sum, defendant appealed.

The principal assignment of error assails the overruling of a motion to direct a verdict in favor of defendant on the ground that the evidence was insufficient to prove actionable negligence as the proximate cause of the bather's death.

Failure to place and maintain warning signs or notices indicating the depths of water in different parts of a public bathing pool conducted for private gain may be evidence of negligence. *Beaman v. Grooms*, 138 Tenn. 320, L. R. A. 1918B, 305; *Larkin v. Saltair Beach Co.*, 30 Utah, 86, 3 L. R. A. n. s. 982.

A leading case on the liability for negligence in conducting for private gain a public bathing resort is *Brotherton v. Manhattan Beach Improvement Co.*, 48 Neb. 563, and 50 Neb. 214. That case has been cited in many jurisdictions. The main features of the opinion were recently reduced in an illuminating note by an annotator to the following form:

"Proprietors of a bathing resort, in discharging the duty of ordinary care for the safety of patrons, may be obliged to keep some one on duty to supervise bathers and rescue any apparently in danger; and may also be held liable for negligence if, on information that a bather is missing, they are tardy in instituting search." 22 A. L. R. 636, and discussion of later cases.

The supreme court of Utah also expressed the view that

proper care for the safety of bathers may require the attendance of some suitable person with the necessary appliances to effect rescues, saying:

"Not only is it the duty of the owners of bathing resorts to be prepared to rescue those who may get into danger while in bathing, but it is their duty to act with promptness, and make every reasonable effort to search for, and, if possible, recover those who are known to be missing." *Larkin v. Saltair Beach Co.*, 30 Utah, 86, 3 L. R. A. n. s. 982.

It is the duty of a bathing resort keeper who grants privileges for compensation to make reasonable provision to guard against accidents liable to befall bathers who indulge in aquatic sports for which he has provided facilities and this may require an attendant to render assistance. *Decatur Amusement Park Co. v. Porter*, 137 Ill. App. 448.

Ordinary care to provide a reasonably sufficient number of attendants for the protection of bathers at a public bathing resort conducted for private gain is a standard of duty in that respect. *Levinski v. Cooper*, 142 S. W. (Tex. Civ. App.) 959.

The duty to exercise ordinary care to protect patrons of a public bathing resort conducted for private gain does not make the proprietor an insurer of their safety. *Bertalot v. Kinnare*, 72 Ill. App. 52; *Rom v. Huber*, 93 N. J. Law, 360, 94 N. J. Law, 258; *Levinski v Cooper*, 142 S. W. (Tex. Civ. App.) 959.

Evidence of negligence does not of itself establish a cause of action, but in addition plaintiff must show that negligence pleaded by him was the proximate cause of the alleged injury.

With these principles of law in mind, did plaintiff prove that actionable negligence pleaded by him was the proximate cause of the bather's death? The answer depends on the evidence and the inferences from evidential facts and circumstances and requires consideration of nearly 200 pages of testimony.

Some of the material facts are not in dispute. For pri-

vate gain defendant conducted a public bathing and swimming pool in what was called "Riverview Park," a resort at or near Stratton, Nebraska. Lengthwise the pool extended east and west. On or near the north bank a bathhouse, a refreshment stand, a diving board, and a diving tower were located. On the south side there were swings, a spring board and a band stand. Richard A. Lyman, a boy about 16 years of age, residing at McDonald, Kansas, and a younger brother were at Riverview Park July 4, 1926. In the afternoon they rented and paid for the use of bathing suits and went into the pool. They were in and out of the water at different times. Richard was strong both mentally and physically, but he could swim very little, if any, and between 4 and 5 o'clock, or a little later, he was drowned near the center of the pool in deep water. The story disclosed by the record cannot be read without emotion, but the sufficiency of the evidence to sustain the verdict must be determined independently of sentiment or pity.

Was defendant negligent in failing to perform his duty to give notice or warning indicating the depth of the water in different places? The pool was approximately 100 feet wide and 300 feet long. It had a sandy bottom sloping from a depth of 2½ feet at the west end to nearly 19 feet at the east end. There were three divisions indicated by two heavy steel cables stretched across the pool from north to south at the surface of the water. The first division was for little folks. It was 20 feet wide at the west end of the pool and near the north bank there was a sign: "Water not over 2½ feet deep." The next or middle division was apparently for general bathing. It was 30 feet wide and near the north bank between the cables there was a sign: "Water not over 4½ feet deep." The other division was that part of the pool between the east cable and the east end. It was obviously intended for swimming, diving and other aquatic sports. In size it was approximately 250 feet east and west and 100 feet north and south. Near the east cable on the north side of the pool there was a sign: "Deep Water. If you cannot swim, stay out." It was around the

latter division that the diving board, the diving tower and the spring board were located—all indicating deep water. In addition there was a life-boat near the bath-house. It was equipped with oars, rope and grappling hooks. The rear end rested on the north bank and the front end was headed toward deep water. Above it there was a sign: "For Emergencies Only." In conspicuous places in the bath-house where Richard A. Lyman and his younger brother rented bathing suits there were in large letters signs containing these words:

"No charge, whatever, is made for either the swings or slide, and we assume no responsibility, whatever, for any accident that may occur in their use. Unless you are an experienced swimmer and diver you are requested not to use them."

At the trial there was an effort to show that the letters on the signs were too small to impart notice for a sufficient distance; that the signs indicating the depth of the water were not high enough to prevent the bank from obscuring them; that the crowds between the signs and the bath-house cut off the view; and that personal warning was not given to the Lyman boys. They were together and were in and out of the pool for two hours or more. They were not seen in deep water. The circumstances indicate that they knew where the water was deep. The younger brother kept in the safety zone. Richard had the same opportunity for observation. He was a bright boy nearly 16 years of age. The slightest prompting of his own senses would have resulted in observing the depths of the water at different places, notwithstanding the crowds. The signs indicating the depth of the water were on the top of steel posts with the lower ends in the ground under the pool. The notices were above the water and faced toward the bath-house where they could be seen by bathers approaching the pool. There is nothing to show that the signs did not conform to the usual custom at bathing resorts or that defendant did not, in this respect, take such precautions for the safety of bathers as a person of ordinary prudence

would have taken under the circumstances. It seems clear that the verdict cannot be upheld for want of notice of the depths of the water and that, therefore, there was error in submitting that issue to the jury.

Was defendant's failure to provide suitable guards and directors the proximate cause of the bather's death? Two employees of defendant, according to their testimony, were qualified to act in those capacities and they said on the witness-stand that they were on active duty at the time. There was no charge or proof that more than two guards were necessary. Unless they were contradicted by circumstances or by failure to perform their duties in the emergency that confronted them, evidence of their qualification and of their proper services was not disproved. There were 50 or more persons in the pool. No one saw Richard as he was disappearing. How or when he got into deep water was not disclosed. He was missed by his younger brother who said on the witness-stand that he had seen some one struggling in the water and had thought it might be Richard, but the witness was apparently not satisfied with his identification, because he went to the bath-house to make a search and, not seeing Richard in the pool or elsewhere, an alarm was given. One of the guards testified he was at the time on duty over-looking the pool from the bathhouse. At the first alarm he ran to the life-boat, rowed south to the spring-board, the natural place to look for a missing swimmer, and began to cast with grappling hooks. He was joined at the spring-board platform by the other guard. After casting in vain five or six times, some one said the boy was farther north. The boat was then rowed northward near the center of the pool, where the water was at least seven feet deep. The second cast there resulted in bringing the boy's body to the surface. It was taken to the bank. Efforts at resuscitation were immediately made and were continued without avail for an hour or more. For the purpose of showing negligence, plaintiff adduced proof that the guard who first reached the life-boat had sold refreshments in the stand at different times

during the afternoon and was not continuously at his post of duty as a guard. This was not evidence of actionable negligence in the present case, if he was attentively watching the pool at the proper place for rescue when the bather disappeared, and his testimony to that effect is uncontradicted. The service of a life-guard may be required at different places at different times. Where many swimmers are engaged in aquatic sports in the same pool, it is common knowledge that divers disappear and return at other places without giving occasion for alarm or rescue. In the present instance no one knew exactly when or where the bather disappeared. Without resorting to speculation or conjecture the jury could not properly find that, except for the failure of the guard to miss the bather and to notice that he did not promptly reappear, there would have been no loss of life. The effort to rescue the bather upon the giving of the alarm was prompt and vigilant. There was evidence that the guards did not wear uniforms or badges to distinguish them from others as life-savers, but they immediately responded to the call of duty as soon as the alarm was given, and the omission, if negligence, was not the proximate cause of the bather's death. It follows that this issue also should not have been submitted to the jury.

Was defendant's failure to provide competent persons to recover and resuscitate the bather the proximate cause of his death? On this issue the evidence showed that defendant had not equipped his life-boat or bathing resort with a pulmotor, a modern instrument used in the work of resuscitation. On the other hand, there is uncontradicted evidence by a competent physician that the guards in a proper manner used standard methods of equal efficacy. The physician was promptly called, arrived within a few minutes and administered restoratives without success. He was called as a witness and in testifying expressed the opinion that the result would have been the same had a pulmotor been used. There was no testimony to the contrary. On the whole case, after an examination of the entire record

from every standpoint, the conclusion is that the plaintiff did not make a case and that the motion to direct a verdict in favor of defendant should have been sustained. Consequently, the judgment is reversed and the action dismissed.

REVERSED AND DISMISSED.