HARRY PERKINS, Administrator of the Estate of CALVIN PERKINS, Deceased, Appellant, v. ROSE BYRNES and MARGARET BYRNES, and ROSE BYRNES and MARGARET BYRNES, d/b/a BYRNES MILL, Respondents, No. 43646—269 S. W. (2d) 52.

Division Two, June 14, 1954.

850

*Ennis & Saunders, Milton R. Fox* and *William R. Kirby* for appellant.

*Thurman, Nixon & Blackwell* and *Dearing & Matthes* for respondents.

BARRETT, C.—In this action by Mr. and Mrs. Perkins for the wrongful death of their son Cal the trial court directed a verdict for the defendants at the close of all the evidence. The defendants, Rose and Margaret Byrnes, own and operate a rural resort, a picnic ground and recreation area, on Big River, in Jefferson County, known as Byrnes Mill. In the resort area there is a concession stand, a picnic ground, some cabins built on leased ground, and an old mill dam across Big River. Byrnes Mill had been in operation

"a great number of years off and on" and the resort season was from May 30th to Labor Day. Cal was drowned while swimming in the resort area below the dam in Big River on Labor Day 1950, and it is claimed that his death was caused by the negligence of the defendants in that they permitted swimming on that day although they knew that the river was "flooded, dangerous and unsafe." Mr. and Mrs. Perkins also asserted that the defendants were negligent in that, knowing of the unsafe condition of the river and failing to prevent swimming on that day, they failed to warn Cal of the dangerous condition of the river, particularly of hidden undercurrents below the dam, and had taken no precautions whatever for the safety of their patrons, that there were no lifeguards on duty, or rescue appliances, and there were no life lines, life buoys or depth indicators.

Cal was nineteen years of age, five feet nine inches in height, and athletic. He was employed by the Belcher Baths in St. Louis as a physical instructor, "physical education for business men." On Labor Day 1950 Cal, four other boys and five girls, went to Byrnes Mill for a holiday outing, a picnic and swimming party. Soon after they arrived Cal, Bryan and Lou Portzell were "fooling around" with a football while the girls unloaded the food. Once the football rolled over a knoll into the edge of the river and Bryan retrieved it. These three boys changed into swimming trunks and Bryan went in swimming first but came out because the water was too cold. As Bryan came out Cal and Lou went in about ninety feet below the dam. They waded out towards the center of the river and, as they waded could feel the current becoming stronger and when the water was about waist deep, as a defense witness said, they "pushed off" and immediately a strong undercurrent precipitated them towards the dam. Cal was drowned and Lou was thrown from the path of the undercurrent and rescued.

 Upon this appeal by Mr. and Mrs. Perkins it is insisted, under the evidence, that the defendants' negligence and consequent liability for Cal's death should have been submitted to the jury, and, therefore, that the trial court erred in directing a verdict. The defendants, on the other hand, insist that there was no evidence from which negligence on their part could reasonably be found, and, in any event, that Cal attempted to swim in Big River, below the dam, after he had been warned or knew of the swollen, obviously dangerous condition of the river and therefore was guilty of contributory negligence as a matter of law. Upon the trial of the cause the defendants sought to leave the impression that Byrnes Mill was not open for business that day and that Cal and his friends were not invitees upon the defendants' premises, but in their argument here the defendants tacitly admit that they were in fact invitees. Hence there is no dispute between the parties as to the applicable general rules, those governing the relationship between the proprietor of a place of public amusement and

his business invitee. Restatement, Torts, Sec. 343. Their reciprocal rights, duties and obligations with respect to both the condition of the premises and the activities carried on there have been set forth repeatedly and it would serve no useful purpose to again state them here. Berberet v. Electric Park Amusement Co., 319 Mo. 275, 3 S. W. (2) 1025; Hudson v. Kansas City Baseball Club, Inc., 349 Mo. 1215, 164 S. W. (2) 318, 142 A.L.R. 858; Hughes v. St. Louis Natl. League Baseball Club, Inc., 359 Mo. 993, 224 S. W. (2) 989, 16 A.L.R. (2) 904; annotation 22 A.L.R. 610. While there are no special rules peculiarly applicable to the particular amusement or activity it must be noted that the fact of whether the patron is a spectator or a participant in the sport is a circumstance to be taken into consideration in determining whether the proprietor has exercised due care for the safety of his patron. The proprietor is not an insurer of his patron's safety, and both the participant and the spectator accept certain hazards or dangers, those that reasonably inhere in the sport so far as they are obvious and usually incident to the game. Hudson v. Kansas City Baseball Club, Inc., 349 Mo., l.c. 1223-1225, 164 S. W. (2), l.c. 322-323; Murphy v. Steeplechase Amusement Co., 250 N. Y. 479, 481-483, 166 N. E. 173. However, there is a difference in circumstance in the hazard of a spectator's being struck by a fly ball while watching a baseball game and what a swimmer may reasonably expect and assume from his host and the natural or artificial facilities provided for his active participation in the sport.

The defendants, in contending that they had discharged the full measure of their duty to their patrons and that there was no evidence from which negligence was a fair and reasonable inference, point to the fact that Big River is a public stream and that they could control neither its depth nor its current. It is urged, considering the character ██ of the premises, the nature of the facilities afforded, and the particular circumstances existing on Labor Day 1950, the muddy, flooded river, that the defendants had exercised the required care to maintain their premises in a reasonably safe condition and had fulfilled their obligation to their patrons. One difficulty with the defendants' argument, however, is that the appeal does not present the same problem that would have confronted the court had the trial court submitted the case to the jury and there had been a verdict in the defendants' favor. Walloch v. Heiden, 180 Ark. 844, 22 S. W. (2) 1020; Thierry v. Oswell, 212 Ala. 418, 102 So. 903; White v. Rohrer, (Mo.) 267 S. W. (2) 31. The trial court, by directing a verdict at the close of all the evidence, has declared as a matter of law that there was no evidence upon which a jury should be permitted to exercise its function of reasoning and find that the defendants were negligent, or, that the plaintiffs were entitled to recover.

It is true that Big River is a natural stream, or, as the defendants say, ''a public stream,'' and they could not control its depth or cur-

rent. But the rules prescribing the duty of care and requiring the proprietor of a place of public amusement to make the known dangerous condition safe or to give a warning adequate to enable his patron to avoid the harm applies to "a natural or artificial condition thereon." Restatement, Torts, Sec. 343. The proprietor or landowner may enclose his land adjacent to a natural stream, and his is the election to determine whether the public is to be excluded or accorded the status of invitees. 39 Am. Jur., Sec. 2, p. 803; 52 Am. Jur., Secs. 44, 46, 71, pp. 288, 290, 315. Once he has made the election and appropriated a part of a public body of water to the uses of his private venture the general rules have been applied to such divergent bodies of water as Lake Ontario, Great Salt Lake, Lake Washington, Lake Pocotopany in Connecticut, Barren River in Kentucky, St. Joseph's River in Indiana, and even to the tidal waters of an arm of the sea. Dinnihan v. Lake Ontario Beach Imp. Co., 40 N.Y.S. 764; Larkin v. Saltair Beach Co., 30 Utah 86, 83 Pac. 686; Grove v. D'Allessandro, 39 Wash. (2) 421, 235 Pac. (2) 826; Nordgren v. Strong, 110 Conn. 593, 149 Atl. 201; Waddel's Adm'r. v. Brashear, 257 Ky. 390, 78 S. W. (2) 31; Bass v. Reitdorf, 25 Ind. A. 650, 58 N. E. 95; Blanchette v. Union St. Ry. Co., 248 Mass. 407, 143 N. E. 310.

The defendants had operated Byrnes Mill for a number of years and Cal and his friends were invitees upon the premises. And normally, no doubt, most people swam in the water above the dam, but as to the water below the dam, which one of the defendants described as "always a rapid current," a defendants' witness said, "In good weather there would be many people" swimming in that particular area. Unquestionably the river was "up" or "swollen," even "high." One of the defendants' witnesses said that it was "at flood stage" and obviously dangerous. Another said that it was "very high" and that the effect of the high water running over the dam was that "It causes an undercurrent there." Others said that it was "very treacherous," or "high," by reason of recent rains. One of the defendants, called as a plaintiff's witness, testified that the river was "high and muddy," almost level with the dam, but "It has been higher before." It is the defendants' position that the river was so obviously muddy and high or "flooded" that Cal must have seen its condition and known that it was dangerous and not suitable for swimming. It was chilly on Labor Day and Cal and his friends were the only people who attempted to go swimming, and it must have been obvious that the river was up and swollen, but there is no evidence that it was at "flood tide" in the sense of being out of its banks, inundating land not normally covered by the flow of the river. 36 C.J.S., p. 1028.

Cal and his friends from St. Louis had not previously been to Byrnes Mill and there is no evidence as to their knowledge of natural

streams and their propensities. Lou Portzell said, "right where we went in, the top of it was just as still as a swimming pool." He conceded that he should recognize "muddy water," and he said, "You could tell out towards the center that it (the current) was was stronger. As much as I could tell about it, it looked stronger." He said that where they were pulled under by the undercurrent "it was fairly smooth," and he could not say whether the river was "high" or "low" but, "It wasn't rough. You couldn't tell it was rough. It looked like regular water. The only part that looked rough was out towards the dam." Cal's father was there on the following day and as to whether the river was "high" said, "It was up some they tell me. It was the first time I had ever been there. * * * They tell me it was up." As to the river's being "muddy," he said, "I think it was to a certain extent." Even a defense witness who had testified that the river was at flood stage said, "Along the edge of the river it was calm, but in the center of the river it was pretty swift." Lou's description of the appearance of the river and its inviting calmness may have been exaggerated, but his testimony was not so obviously contrary to physical facts, common knowledge and experience that it must be rejected for total lack of probative force and value. Murphy v. Fred Wolferman, Inc., 347 Mo. 634, 148 S. W. (2) 481.

 As indicated, the rule imposing liability upon the proprietor of a place of public amusement has been applied to the hazardous conditions in natural lakes, rivers, and a portion of the sea. In Dinnihan v. Lake Ontario Beach Imp. Co., supra, the deceased was drowned in a deep hole near a toboggan slide, just outside the enclosed swimming area. The hole could be seen by looking down into the water. It was held that the proprietor of the swimming resort "was bound to be active and exercise vigilance to keep the grounds whereon it invited its customers to bathe from becoming dangerous; that this duty was an active one, and that the defendant could not escape liability by showing simply that it did nothing to produce this hole. * * * We think there was evidence from which the jury were justified in finding that the defendant was guilty of negligence in not knowing of and guarding against this dangerous place, * * *." In Waddel's Adm'r v. Brashear, supra, a boy dived from a rope into a swimming area on Barren River, the river was too shallow for diving and the boy's head struck the bottom of the river. In considering the proprietor's duty and the care to be exercised in connection with his facilities the court said, "This involves the duty of being diligent to see that water in a diving pool is of sufficient depth to make it reasonably safe for the purpose; or, if it be not safe for that sport with the use of the facilities furnished, there arises the duty to warn or caution patrons by signs or otherwise of the hazard, particularly of any latent or hidden condition of danger." In Blanchette v.

Union Street Railway, supra, the plaintiff slid down a diving chute when the tide was out and was injured by reason of the shallowness of the water. The Massachusetts court said that "the jury could find the plaintiff had reasonably acted upon the assumption that the place which he used at the express invitation of the defendant apparently was reasonably safe to use for the purpose to which it was adapted in the way in which it and the appliances were customarily used. The defendant, as the provider of accommodations of a public nature for hire, was bound to use reasonable care in furnishing and maintaining such accommodations for the purpose for which they were apparently designed and to which they are adapted. If by reason of the shallowness of the water the chute and the water beneath it were not reasonably safe for diving, it was the duty of the defendant to warn the plaintiff * * * of the unsafe condition in order that he might be made aware of the danger, and, if it failed to perform this duty, it was guilty of negligence * * *." If shallow water, hidden logs, or a concealed hole, present a jury question of negligence and consequent liability on the part of the proprietor of a public bathing resort, a fortiori, a swollen river with a hidden or deceptive undercurrent is a circumstance upon which reasonable minds could differ. If the hazard of swimming in ██ Big River was great, the peril was one that could have been easily guarded against.

Several "no trespassing" signs "without permission" were posted on the premises, and there was one dim, partially obliterated "WARNING" sign near the concession stand, which the defendants' witnesses read with great difficulty. That sign bore the caption, "WARNING—SWIMMING—FISHING—BOATING—WADING." It said, "The Water in any Course such as Big River is always more or less Dangerous, therefore always be careful whenever you go into the water and also when you go in Not Responsible for cases of drowning or accidents in the River, James Byrnes, Prop." But Lou Portzell did not see the sign and there is no evidence that Cal, or anyone else in the party, saw the warning sign. A man who had a summer house on the grounds said that he saw someone in swimming and, recognizing a boy in the group, Eddie Klinger, told him that the river was dangerous and said, "If I were you, I would warn him." Another summer guest saw a boy retrieve the football and said, when the boy came up the hill, "I advised him it would be better to lose the football than to go into the river when the water was in that condition." After lunch and after the drowning this man looked for the boy he had talked to but was unable to find him. A lady, whose family had a cabin in the resort area, said that she and her daughter, Nancy, went down to look at the river. They saw a boy go after the football and as the boys, including Cal, passed, Nancy said, "Any of you boys or anyone that goes in the river a day like this is certainly a fool." But Nancy, in testifying, said, "I would like to correct

her statement. I did not address the boys. I did not address them. I said to her loud enough the boys could hear. It was indirect warning. I knew a nineteen year old girl telling a bunch of boys not to go in swimming wouldn't work. I turned to mother with the boys passing close to me, I said, 'Anybody that would go in the water today would certainly be a fool.' '' Nancy was positive that one of the passing boys was Cal. But Lou testified that they saw no warning signs and that no one warned them about going into the water.

Admittedly, there were no life boats, life belts, life lines, life bouys, life guards, depth notices, notices warning of the high water or the swift undercurrent, or, for that matter, any form of safety or warning device, although one of the defendants said, ''We do have those things, but didn't have anything out that day. We have them at times, you know, if they would be needed, but there wasn't anything open to the public.'' The concession man said, ''Byrnes used to have a rope down there. Whether they did that day or not, I don't know. They generally put a rope up around the walkway. * * * There wasn't no signs saying they were closed, no.'' In all the circumstances whether the defendants had exercised the requisite care and fulfilled or breached their duty to their patrons was for the jury to determine. Larkin v. Saltair Beach Co., supra; Dinnihan v. Lake Ontario Beach Imp. Co., supra; Grove v. D'Allessandro, supra; Beaman v. Grooms, 138 Tenn. 320, 197 S. W. 1090; Lyman v. Hall, 117 Neb. 140, 219 N. W. 902; City of Longmont v. Swearingen, 81 Colo. 246, 254 Pac. 1000; Collins v. Riverside Amusement Park, 61 Ariz. 135, 145 Pac. (2) 853; Decatur Amusement Park Co. v. Porter, 137 Ill. A. 448. There was evidence from which a jury could have found warning or that the dangerous condition was so open and obvious that only the foolhardy would have attempted to go swimming in Big River on Labor Day 1950 but those are not the only inferences to be drawn from the facts and circumstances and it may not be said as a matter of law that Cal was guilty of contributory negligence. Waddel's Adm'r. v. Brashear, supra; Blanchette v. Union Street Ry. Co., supra; Thierry v. Oswell, 212 Ala. 418, 102 So. 903. Compare: Bass v. Reitdorf, supra; Johnson v. Hot Springs Land & Imp. Co., 76 Ore. 333, 148 Pac. 1137.

The trial court erred in declaring as a matter of law that there was no evidence of negligence or that Cal was guilty of contributory negligence, both questions were for the jury. Accordingly the judgment is reversed and the cause remanded. *Westhues* and *Bohling*, *CC.*, concur.

PER CURIAM:—The foregoing opinion by BARRETT, C., is adopted as the opinion of the court. *Leedy, Acting P.J.*, and *Dew* and *Stone*, Special Judges, concur.