[Civ. No. 5948. Fourth Dist. Dec. 4, 1959.]

DONNA MAE SORENSEN, a Minor, etc., Respondent, v. CLAUDIA HILL HUTSON et al., Defendants; QUINN VAUGHAN, Appellant.

John R. Allport for Appellant.

Richard T. Drukker as Amicus Curiae on behalf of Appellant.

Betts, Ely & Loomis for Respondent.

GRIFFIN, P. J.—Plaintiff and respondent Donna Mae Sorensen, a minor aged 17, by her guardian *ad litem* Hazel Mae Sorensen, brought this action against defendants Claudia Hill Hutson (operator of the Chris-Craft speed boat "Hill-A-Rill"); Hugh Hutson, Jr., her husband; Robert Lee Hill, her father; Mary Ellen Hill, her mother; individually and doing business as Robert Hill's Chef's Inn, a copartnership (hereinafter referred to as partners); Hugh Scott Hilles, operator of an outboard skiing craft; The Irvine Company, a corporation, owner of the land here involved; and defendant and appellant Quinn Vaughan, lessee; for damages for loss of respondent's left arm and other injuries alleged to have been the result of negligence of all defendants, arising out of a collision of these boats resulting in a verdict of the jury for the sum of $200,000 against defendants partners and appellant Quinn Vaughan, lessee, which judgment is not claimed to be excessive. The verdict relieved defendant Hugh Scott Hilles of any claim of negligence and a nonsuit was granted as to The Irvine Company.

Vaughan perfected an appeal from the judgment. The remaining defendants (partners) filed a notice of appeal. This appeal was not perfected. It appears from the record that their insurance carrier, through respective counsel, paid $102,546.86 (the amount of its liability) to plaintiff as partial satisfaction of said judgment and the court approved it on behalf of the minor. The order of approval included a proviso that the attorneys for plaintiff should, in their discretion, determine at what time and against which of the defendants execution should issue in the enforcement of the collection of the balance of the judgment.

A motion by respondent to dismiss the appeal by the part-

ners for their failure to perfect it was here made. It was opposed by their present counsel who appeared and filed an amicus curiae brief arguing that these particular defendants (partners) now found themselves in a most hazardous position and strongly suggested that the judgment against appellant Vaughan be upheld or, if a reversal is necessary as to him, the court should order a reversal of the entire judgment. Citing such authority as *Fortier Transportation Co.* v. *Union Packing Co.,* 96 Cal.App.2d 748 [216 P.2d 470]. It was ordered that the ruling on the motion be determined in the decision on the merits. In accordance with rule 10(a), Rules on Appeal, and in view of the conclusions hereinafter reached, the motion to dismiss their appeal should be granted. (*Wilkins* v. *Wilkins,* 108 Cal.App.2d 12 [237 P.2d 684].)

The principal question raised on this appeal by appellant Vaughan is the sufficiency of the evidence to support the verdict of negligence as to him. The factual background, tersely stated, is this: Defendant The Irvine Company owned a certain parcel of land (four or five acres) adjoining the easterly edge of the upper Newport Bay. It was about 1,100 feet in length and about 300 feet in width and surrounded on the east by a fence with a gate entrance. The property involved extended westerly in said bay to the mean high-tide line. The strip had been filled in by dredged sand. The Irvine Company leased this property to appellant Vaughan under certain specified conditions . . . for the launching and removal of privately owned boats into and from Newport Bay adjacent to said premises by means of the boat ramp now constructed on said premises; for the parking of automobiles of the patrons of said ramp and sale to patrons of food. Lessee agreed to occupy said premises for the uses and purposes therein designated and not otherwise and to conduct his operations in accordance with all public laws, ordinances and regulations applicable.

The concrete boat ramp (60 feet long by 20 feet wide and constructed about 6 to 8 inches above the level of the sand) was located near the southerly portion of said strip and extended lengthwise westerly into the bay on the same gradient as the shore, which was estimated at 7 to 8 per cent. At extreme high tide the waters of the bay completely covered the ramp and at extreme low tide the waters receded to a distance about 6 feet west of the end of the ramp. There was evidence that the mean high tide line described in the

lease as the westerly boundary of this leased strip was near the westerly end of the float.

Vaughan, the lessee, was employed by The Irvine Company during working days; he employed one Clyde Frankel as his general supervisor of the property. The place was open to the public from early in the morning until 9 p. m. A charge of $1.00 was made for customers parking their cars and for boat launching from the ramp, and 50 cents for parking a car and general use of the facilities offered, such as boating, picnicking, skiing to and from the shore and extra charges for use of barbecue equipment and store supplies.

General rules for patrons of said leased premises and activities in connection therewith were posted on a shack located on the property and constitute one of the principal issues here involved. They read in part:

"Upper Bay Ramp, Bayside Drive, 1¼ mile north of 101. Coast Highway. Suggestions for your safety.

1. Traffic pattern:

 (a) Traffic shall move in a counter-clockwise direction at all times. Orange County Harbor Ordinance No. 490.

 (b) A motor boat in the process of towing should have the right of way.

 (c) Motor boats leaving and approaching the shore shall follow a counter-clockwise pattern.

 (d) A motor boat with a man overboard or a fallen skier or aquaplaner is permitted to turn around and pick up that person *if* he is clear and *if* the person is over his head in water.

. . . . . . . . . . . .

5. Swimming or wading is not advised in this area.

. . . . . . . . . . . .

9. There is no speed limit on motor boats operating north of the posted area.

Upper Bay Ramp Management

APPROVED: Russell Craig, Newport Harbor Master
Heinz Kaiser, Orange County Supervisor"

It was also shown that mimeographed copies of these rules were circulated throughout the district to hundreds of prospective customers, indicating that there was no speed limit on motor boats operating north of the posted area (agreed to be considerable distance south of this property) where

the maximum speed limit was set at 5 miles per hour. On holidays and Sundays, this concession attracted many customers, estimated up to several hundred people, because of the limitation of speed in lower parts of the bay and other conveniences. On these days, Vaughan employed a special deputy sheriff to enforce the rules and to generally supervise the actions of invitees and others using these facilities. On Wednesday, September 8, 1954, the day of the accident, about noon, respondent and her party entered the premises after payment of the required fee, launched their 14-foot outboard motorboat and proceeded to ski, starting from the shore north of the ramp and generally enjoying the facilities, including wading on the shore by children of the party. There were other guests so occupying the property. About 5 p. m. appellant visited the property, saw that there were only two or three trailers and a small crowd still there, so he allowed Frankel, the manager, whose duty it was, as stated by appellant, to assist in the operation of the premises and to endeavor to prevent any improper or dangerous conduct affecting patrons and to caution boats coming too close to shore, to go home. A few minutes later, appellant did likewise and left the place unattended.

Defendants Hutson and others came to these premises about 6 p. m. in a 22-foot Chris-Craft inboard to ski. The remainder of their party came by cars, entered the gate, prepared to pay the customary charge but found no one in attendance so they entered and joined the Hutsons in skiing from the shore, north of and near the ramp. There families, children and others were wading and participating in a beach picnic nearby. It was common practice for skiers, both experienced and inexperienced, to take off from this beach and it was the usual custom for bathers to bathe toward the northern portion.

About 7 p. m. defendant Hilles and party decided to teach respondent how to ski. In the outboard they made two or three attempts to take her from a position about 10 feet in the water in a northerly direction with a 60-foot ski rope, without success. She, each time, fell near the shore. The outboard and occupants pulled in the line, turned to their left and returned toward the shore to make another start. On the third attempt the outboard was in the process of returning to the shore where respondent was standing adjusting her skis preparing for another takeoff. Claudia Hutson, who had been operating the Chris-Craft in a counterclockwise direction north and across the front of the leasehold

property, pulling two experienced skiers on single skis, had just completed a third round and was coming northward again at about 25 to 30 miles per hour with the intention of allowing her skiers to ski to shore as she passed. In doing so, she collided with the returning outboard boat about 75 to 100 feet north of the ramp. The Chris-Craft veered to the shore, striking respondent and severing her left arm and severely injuring her chest. No doubt her life was saved by the presence of a physician who was likewise with his family and friends enjoying these facilities.

The evidence is conflicting as to where Mrs. Hutson was driving the Chris-Craft on these several rounds in relation to the shoreline opposite appellant's concession. Some witnesses stated she came within 30 to 50 feet of the shoreline, over or near the center of the ramp covered by water and then the boat proceeded north in that same general path until it collided with the outboard. She and others placed it at a distance of 65, 70 to 100 feet from shore. Witnesses from the shore testified Mrs. Hutson was in the last turn, driving the Chris-Craft on the water over the leased property, looking back at her two skiers and paying no attention to the presence of the outboard, its skier or bathers or children occupying the shores immediately around the place where the outboard skier was about to leave the shore; that many shouted but she did not take heed.

Mrs. Hutson testified she saw the outboard for a distance of 250 feet before the boats came together; that she pressed the horn at least 10 times to warn the occupants of the outboard but they were not looking, and she endeavored to avoid them but failed.

As bearing upon the claimed negligence of appellant, lessee, it is pointed out that he did erect a sign on a pole in the water several hundred feet south of the leased property, reading: "Keep to starboard side of channel at all times. Observe State Code 267 & Or. Co. Harbor Ord. 490. All take offs from this landing must be to your right." On the other side (the larger one) read: "Warning. State Law No. 267 restricts speed boats to 5 m.p.h. within 100 feet of persons in the act of bathing."

Ordinance 490, above mentioned, provided that in the area of the bay north of the Shell-maker Inc. derrick (which is the area where the accident occurred), the limitations of speed are the same as those prescribed by section 267, above mentioned. That section of the code, then in effect, provided:

"Every owner, operator . . . of any power boat, is guilty of a misdemeanor who operates it or permits it to be operated at a speed in excess of five nautical miles per hour in any of the following areas: (a) Within 100 feet of any person who is engaged in the act of bathing (b) Within 200 feet of any: (1) Beach frequented by bathers . . . The provisions of this section shall apply to all waters which are in fact navigable regardless of whether they are declared navigable by this code."

 It is argued by respondent that from this language it is fair to conclude that Vaughan knew, or should have known, the speed limitations set forth in the code section and ordinance cited and that he chose to advise users of his recreational area that there was no speed limit. In this connection, Mrs. Hutson testified she did not see the sign described but she observed there were no signs saying there was a speed limit in the area and since she had been on the premises a number of times and observed the absence of such sign, it gave her the impression there was no limit. The beach, without question, was one "frequented by bathers." The jury might well have believed that she was deceived by appellant's misinformation on the sign and in the rules and that this was a proximate cause of the accident. It further appears that Vaughan had not installed any ropes, chains or other protective devices which would establish an area for bathers. Neither had he designated any area for the use of beginning skiers, or erected any barricades or protective devices to prevent injury to them. In creating and operating this recreational area, he brought together in a restricted area persons engaging in various activities including boating, skiing, learning to ski, bathing and picnicking. If any of these activities created dangers to any of his patrons, appellant was obliged to use reasonable care for their safety. This issue was submitted to the jury under appellant's given instructions, reading:

"The law does not necessarily require that the operator of premises such as the Upper Bay Ramp area provide roped off areas, buoys or markers for swimmers, bathers or beginning water-skiers. The question is whether or not a reasonably prudent man under the same or similar circumstances would have provided such protective areas. In determining the question you should consider all of the conditions and circumstances surrounding the establishment and operation of the area and the happening of the accident. Even though

you should find from the evidence that the presence of roped areas, buoys or markers would have been desirable you still may not return a verdict against said defendant in respect to these matters unless you find from all the evidence that such failure to provide protective areas was a proximate cause of the accident and injury to plaintiff.''

The jury could have logically concluded that in addition to having a duty to warn boats coming in too close to shore, appellant should have provided buoys or markers to indicate an area of restricted speed, or should have provided, by ropes or other means, a protected area for swimmers, bathers and beginning water skiers. Such measures would have furnished protection whether or not there was an attendant on duty in the area.

Human experience has taught most of us, in the modern day, that the commingling and confining of skiing activities with bathing activities in a congested area such as here involved, presents an immediate problem for everyone involved and does require proper supervision on the part of concessionaires and precaution to prevent injury to guests and invitees taking advantage of the facilities offered. *Skelly* v. *Pleasure Beach Park Corp.*, 115 Conn. 92 [160 A. 309] ; *Perkins* v. *Byrnes*, 364 Mo. 849 [269 S.W.2d 52, 48 A.L.R.2d 97] ; *Stockwell* v. *Board of Trustees*, 64 Cal.App.2d 197 [148 P.2d 405].

It is agreed that the plaintiff was an invitee upon Vaughan's premises and that appellant owed her the duty of maintaining the property in a reasonably safe condition and of exercising reasonable care to protect the invitee from injury. Defendants, partners, were, for all intents and purposes, patrons of his recreation area as opposed to trespassers. It affirmatively appears, although the evidence is conflicting, that the accident happened while they were operating the Chris-Craft on waters overlying appellant's leased premises and were not, at the time, as appellant contended, on waters of the bay entirely outside of appellant's control. In *Skelly* v. *Pleasure Beach Park Corp., supra,* it was said:

''One who assumes to offer the use of public waters for bathing in connection with bath-houses and other appropriate appliances maintained by the owner of the shore owes a duty to exercise reasonable care to prevent injury to patrons who use the waters in the usual and ordinary way and consistent with the invitation extended.''

The California courts have held that the owner or

occupier of premises is liable for negligently failing to protect an invitee against conduct of third persons. *Stockwell* v. *Board of Trustees, supra*; *Sample* v. *Eaton*, 145 Cal.App.2d 312 [302 P.2d 431]; *Thomas* v. *Studio Amusements, Inc.*, 50 Cal.App.2d 538 [123 P.2d 552]. *Edwards* v. *Hollywood Canteen*, 27 Cal.2d 802 [167 P.2d 729], held that the occupier of such premises "is under a duty to protect visitors such as plaintiff by taking appropriate measures to restrain conduct by third persons which he should be aware of and which he should realize is dangerous."

Appellant argues that these cases are predicated on the fact of prior or previous notice of such conduct and that he had no prior notice of Mrs. Hutson's conduct in time to prevent the injury and if he had had a guard or someone present to warn her such warning would have been no different than that given by the spectators who shouted at her. The evidence, though in conflict, does show that she had made two such previous trips across the waters of appellant's leased premises, within 20 minutes of the time of the accident. Had appellant or his employee been present, a warning at that time might have prevented the accident. Vaughan himself testified he tried to make the place reasonably safe for his invitees; that if he saw a boat operator violating the rules or appearing to come too close to the shore he would make suggestions to him to keep out at least 100 feet from shore and a safe distance from his patrons and any distance within 50 feet of the waterline would not be a safe distance; that when he was there he tried to advise boat owners to this effect and his instructions to his employees were to do the same.

This testimony, along with other testimony which Vaughan gave, shows there had been previous occasions when boats had followed a path closer to the shore than Vaughan considered to be safe. He admitted that any operations within 50 feet of the shore would be unsafe; that boats had previously operated too close to shore and had been warned and in addition he instructed his attendant to warn boats within the danger area. The jury was entitled to conclude from the evidence that had Vaughan's attendant not gone home early on the day of the accident he would have observed the negligent operation of the speed-boat and would have been able to take steps to avoid the accident. It was also for the jury to determine whether the absence of a guard or attendant was the proximate cause of the accident. *Stockwell* v.

*Board of Trustees, supra; Taylor* v. *Oakland Scavenger Co.,*
17 Cal.2d 594 [110 P.2d 1044].

There is merit to the claim that appellant, in an en-
deavor to attract business to his premises, advertised that
there was no speed limit there to prevent skiers from taking
off and landing, notwithstanding the ordinance and state law.
There was testimony of Claudia Hutson, from which the jury
could well have concluded that she was aware of rule 9
promulgated by appellant advising that there was no speed
limit; that she believed it to be true and relied upon it in
the operation of her boat; that if she had been correctly
advised she would not have been operating her boat that close
to shore at a fast rate of speed and accordingly the accident
would not have happened.

There was some question from the evidence whether she
did in fact have at her home and did read rule 9 before the
accident. In her deposition she was quite certain of it, or
that she read one like it and relied upon it, but at the trial,
after her husband said he did not bring one home until after
the accident, she was in some doubt about whether the one
she read was similar to the one in evidence or was one like it.

Probably the most damaging testimony against appellant
in respect to these so-called rules, which included rule 9, was
the notation at the end indicating they had been ."approved"
by Heinz Kaiser, supervisor, and Russell Craig, harbor master.
They both took the witness stand and testified they had not
authorized their names to be attached to or published in con-
nection with said rules and that they never knew they were
so published or posted until after the accident. Appellant
explains his actions by stating he did talk over the general
subject matter with a Mr. Noble, one of their assistants and
appellant concluded from his conversation that these persons
had indicated no disapproval of his rules.

Next, appellant complains because the court gave
plaintiff's instructions to the effect that Harbors and Navi-
gation Code, section 267, applied to the facts in this case and
in refusing appellant's proffered instructions that this section
was not applicable to persons engaged in the sport of water-
skiing, i.e., it is contended that plaintiff was not in the act
of bathing but in the act of water-skiing and was not a
member of the class protected by that section. We see no
merit to this argument. A proffered instruction on this sub-
ject was properly refused. There was evidence that other
persons were in the act of bathing or wading at the time and

that this beach was one frequented by bathers. In addition, the jury was entitled to know the applicable law relating to speed limits in this area to assist it in determining whether appellant had exercised reasonable care in preparing and publishing rule 9 for distribution.

Appellant's proffered refused instruction patterned after BAJI No. 144 in relation to basic speed of motor vehicles on a highway was not here applicable. See section 513, Vehicle Code, 35 California Jurisprudence 2d, page 511.

Error is claimed in refusing to give appellant's proffered instruction to the effect that under section 267, *supra,* the sport of water-skiing could not be legally conducted by anyone at the time and place in question and accordingly plaintiff was also violating the law and guilty of contributory negligence. Section 267 was read to the jury. The question of its application to plaintiff and her conduct was properly left to the jury in a proper instruction given on the doctrine of contributory negligence. Other refused proffered instructions were sufficiently covered by other given instructions. We conclude the jury was fully and fairly instructed on all issues in the case.

The last claim of prejudicial error involves the Irvine lease received in evidence, without objections. One paragraph (7) states that lessee shall maintain for the benefit of lessor and lessee property damage and public liability insurance in connection with lessee's operation, in such form and amount as shall be approved by lessor. The purpose of its admission in evidence did bear mainly on the claimed liability of The Irvine Company. No subsequent reference to the lease was made until 24 days later and no motion to strike it or any of its provisions was ever made. After all parties had rested their case and during the argument to the jury, counsel for plaintiff made reference to the lease, but not to the paragraph regarding insurance. Counsel for appellant, in chambers, requested the court not to allow the exhibit (lease) to be sent to the jury room unless the jury asked for it and in such event suggested that such paragraph be deleted. After some argument, the court denied the request. It does not appear that counsel for respondent thereafter ever made reference to it, that the exhibit was ever sent to the jury room or that the jury ever made such a request. No prejudicial error appears in this respect. (88 C.J.S. p. 282, § 139; *Ellis* v. *Penny,* 121 Kan. 91 [245 P. 1044]; 53 Am.Jur. p. 138, § 153; *Taylor* v. *Oakland Scavenger*

*Co., supra*; *Mullanix* v. *Basich,* 67 Cal.App.2d 675, 682 [155 P.2d 130].)

Defendants' (partners) appeal dismissed. Judgment affirmed.

Mussell, J., and Shepard, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied January 27, 1960.