CITY OF NEWPORT, Plaintiff in Error, v. J. FLETCHER FORD, Administrator, etc., Defendant in Error. —393 S.W.(2d) 760.

Eastern Section. April 27, 1965.

Certiorari Denied by Supreme Court August 16, 1965.

668

Kramer, Dye, Greenwood, Johnson & Rayson, Knoxville, for plaintiff in error.

J. H. Felknor and C. S. Rainwater, Dandridge, for defendant in error.

McAMIS, P.J. J. Fletcher Ford, administrator, brought this wrongful death action against the City of Newport to recover for the death of his intestate daughter, Becky Ford, aged 11, who was drowned while swimming in a pool owned and operated by the defendant. There was a verdict and judgment for $10,000.00 from which defendant prosecutes this appeal.

The declaration charges, inter alia, that the defendant negligently allowed the water in the pool to become dark and discolored, preventing a speedy discovery and removal of plaintiff's intestate from the pool after she became submerged and negligently failed to keep a proper lookout for, and to observe and supervise her swimming activities.

Being required on plaintiff's motion to plead specially, defendant filed special pleas. In substance, its pleas admit

that Becky Ford, having paid the twenty-five cents admission fee, was admitted to the pool on July 2, 1963, as charged in the declaration, and that, on that date, the pool was well attended but not crowded. It was admitted that plaintiff's daughter Becky was drowned during the afternoon of that date. It was denied that her death was due to any of the causes set forth in the declaration. The pleas assert that defendant had on duty an adequate number of well trained guards and that they at all times maintained an alert and careful watch over persons in the pool. It was further averred that water in the pool was clean and suitable for swimming. The pleas contain no specific denial that the water was discolored to some extent.

On July 2, 1963, Becky and her companion, Mary Cureton, aged 12, were taken to the pool by Becky's mother about 1:00 P.M. Mrs. Ford then returned to her home. The two girls remained in and around the pool until about 4:30 P.M. when Mary Cureton noticed that Becky was missing. She immediately searched for her by looking around the pool and dived into the water but could not find her. She then notified one of the three lifeguards on duty that Becky was missing and informed him where she had entered the pool. She testified the lifeguard then stated he 'thought'' he saw a body on or near the botton of the pool, dived in and brought Becky to the surface. She was placed on the deck of the pool and artificial respiration attempted without success.

The record shows without dispute that the filter had been off on the preceding night; that it was off when the pool opened about 1 P.M. and that when it was turned on a substance having the appearance of rust was forced into the pool. According to plaintiff's witnesses this sub-

stance largely permeated the water in the pool. They variously describe it as "rust colored", "dark", "murky" and "discolored". According to some of the witnesses, at the 6′ level where Becky was found, the bottom could not be seen.

As to the second charge that the lifeguards negligently failed to lookout for and observe the intestate's swimming activities, Mary Cureton testified that just before she told the lifeguard Becky was missing she had seen two of the lifeguards passing a football across the pool. The other lifeguard was alongside the pool rather than in the elevated seat from which he would have had a better overall view of the swimming.

As to the length of time Becky was missing before being removed from the pool, her companion, Mary Cureton, testified that it was about three or four minutes after Becky went in the pool that she realized she was missing. She looked for her three minutes and then called the lifeguard.

It appears without dispute that no one saw Becky go down, come to the surface or struggle in the water. It does appear that her head fell to one side as she was being brought out of the pool, indicating that she was not incapable of struggling in the water. When examined by Dr. Shultz some time later rigor mortis had set in. It was his opinion that rigor mortis was the cause of muscle stiffness which he observed, though he recognized the possibility that "she might have been struggling and tensed her muscles that way."

There were no abrasions or bruises on the body of decedent; nor were there any broken bones. The evidence for defendant is that, while the water in certain parts of

the pool became discolored when the filter was cut on, it was not discolored to the extent described by witnesses for the plaintiff and not at all where Becky was found, also that the only passing of the football that occurred was that one of the guards caught the ball when someone threw it out of the pool and tossed it back into the pool. In so far as defendant's proof conflicts with the proof offered by the plaintiff, however, we can not consider it.

It is axiomatic that on appeal from a judgment based upon a jury verdict the review is not for the purpose of ascertaining where the weight of the proof lies but only to determine whether, taking the strongest legitimate view of the evidence and every reasonable inference to be drawn therefrom, there is material, credible evidence to support the verdict. In resolving this question we are constitutionally bound to reject as untrue all evidence in conflict with the evidence supporting the verdict. D. M. Rose & Co. v. Snyder, 185 Tenn. 409, 206 S.W.(2d) 897 and cases cited; City of Chattanooga v. Bellew, 49 Tenn.App. 310, 354 S.W.(2d) 806; Browning v. St. James Hotel Co., 49 Tenn.App. 396, 355 S.W.(2d) 462; McFerrin v. Crescent Amusement Co., 51 Tenn.App. 13, 364 S.W. (2d) 102. Other cases almost without number could be cited for the rule.

The operator of a swimming pool, at least where an admission fee is charged, is bound to exercise reasonable care for the safety of his patrons. This includes the duty to make known and warn against any hazardous condition of which the proprietor has, or should have knowledge and in general to exercise care commensurate with the danger known or reasonably to be apprehended, with due regard to the age of the patron and his presumed ability to look out for his own safety. The operator

must exercise ordinary and reasonable care to maintain the water and facilities intended for the use of patrons in a reasonably safe condition and must furnish an adequate number of competent lifeguards to promptly rescue and, if possible, resuscitate patrons found to be missing or in difficulty. Mullen v. Russform, 169 Tenn. 650, 90 S.W.(2d) 530; Management Services, Inc. v. Hellman, 40 Tenn.App. 127, 289 S.W.(2d) 711; Lyman v. Hall, 117 Neb. 140, 219 N.W. 902; Nolan v. Y.M.C.A., 123 Neb. 549, 243 N.W. 639; Langheim v. Denison. etc., Pool Ass'n, 237 Iowa 386, 21 N.W.(2d) 295; Mock v. Natchez Garden Club, 230 Miss. 377, 92 So.(2d) 562; Perkins, Admr. v. Byrnes, 364 Mo. 849, 269 S.W.(2d) 52, 48 A.L.R.(2d) 97; 4 Am.Jur.(2d) 207, Amusements and Exhibitors, Section 84; Anno. 48 A.L.R.(2d) 104.

■ As these authorities recognize, however, the proprietors of such places of amusement are not insurers of the safety of swimmers and are not responsible for injuries from risks inherent in such activity.

■ Measured by these principles and taking that view of the evidence most favorable to plaintiff as we must on appeal we have no difficulty in concluding that the question of defendant's negligence was for the jury.

It was the duty of the lifeguards, defendant's employees, to maintain a lookout for swimmers found to be missing or in difficulty. This does not necessarily imply that every time a swimmer disappeared from view a search should be instituted. It is well know that swimmers often swim under water after submerging. It does mean, however, that lifeguards should be on the alert for persons struggling in the water or apparently in difficulty and be in position to promptly remove them from the water.

In this case, we think, the jury could well find from the proof that defendant disabled itself from a performance of this duty. The murky condition of the water materially interfered both with the duty of maintaining a lookout for persons in difficulty and with effecting their rescue after discovery that they were missing. The inattention of the lifeguards while throwing the ball combined with the condition of the water to deprive decedent of the benefit of that due care which she had a right to assume would be exercised at all times for her safety.

In effect, defendant breached its duty to see to it that the water in the pool was in a reasonably safe condition for swimmers and invited decedent into a place of danger. Having done so, instead of the lifeguards exercising extra care, commensurate with the increased danger from the discoloration of the water, two of them permitted their attention to be diverted from their duty by passing the ball. At the same time, the other guard was not in the elevated chair from which he could effectively observe the entire pool, or so the jury might find. By providing three lifeguards, defendant seems to have recognized the need for three. Decedent was deprived of the services of two and partially of the third.

A more difficult question is whether plaintiff's proof establishes a causal relationship between the negligence of defendant and the death of plaintiff's intestate.

Defendant argues strongly that it is impossible in any case to search out every swimmer who disappears from the view of lifeguards and ascertain that such persons are not in difficulty and that, even though the water had been clear and all lifeguards on the alert, in the absence of any proof that Becky struggled in the water, she still might have drowned before being discovered and rescued

—that swimmers not infrequently drown from unforeseeable causes such as cramps and heart failure.

The argument is only partly correct. It is true a search can not be instituted every time a swimmer disappears from view and that there is no direct proof that Becky struggled in the water. On the other hand, it is common knowledge that persons about to drown do struggle unless incapable of moving the body and limbs and as we have seen such evidence as we have indicates that when removed Becky's body was limp. It is because swimmers are subject to unpredictable and unpreventable physical impediments and disabilities that lifeguards are needed and that the water should be reasonably clear to facilitate discovery and prompt rescue.

While regrettably there is no evidence as to how soon artificial respiration must be given after the lungs are filled with water to revive the victim, we can not say as a matter of law that the delay of up to 8 minutes, appearing in this case, was not a proximate cause of death. To a swimmer in difficulty time is of the essence. We must assume the jury found the probabilities to be that if the water had been clear and the lifeguards performing their duty Becky would have been discovered either by her companion or by the lifeguards and rescued in time to save her life.

We think defendant's motion for peremptory instructions was properly overruled, the questions of negligence and proximate cause being for the jury.

''It was for the jury to weigh the probabilities in the light of all the proof and determine the weight of the inferences to be reasonably drawn from the circumstances relied upon by plaintiff in the light of the possibilities or

probabilities appearing from the proof offered by defendant. Because there were possibilities or even probabilities opposed to the circumstantial evidence in the case did not overcome as a matter of law the force of the circumstantial evidence, and in such a case a verdict based on the whole evidence would not be the product of speculation and conjecture. Law v. Louisville & N. R. Co., 179 Tenn. 687, 170 S.W.(2d) 360.'' Johnson v. Ely, 30 Tenn. App. 294, 205 S.W.(2d) 759.

In support of the motion for directed verdict defendant's brief cites and relies upon Mullen v. Russworm, 169 Tenn. 650, 90 S.W.(2d) 530, supra; Swan v. Riverside Bathing Beach Co., 132 Kan. 61, 294 P. 902, 903; Lyman v. Hall, supra, 117 Neb. 140, 219 N.W. 902 and Nolan v. Y.M.C.A., supra, 123 Neb. 549, 243 N.W. 639. When properly analyzed we do not believe any of these cases, all of which have been carefully studied, supports defendant's right to a directed verdict under the peculiar facts of this case.

In the Mullen case, as pointed out in the opinion of Mr. Chief Justice Green, there was nothing to indicate what time in the afternoon of the tragedy the decedent was drowned or in what part of the pool; there was no proof the lifeguards were inattentive or that their observance of swimmers and the rescue were impeded by discoloration of the water.

In the Kansas case of Swan v. Riverside Bathing Beach Co. the charges of negligence were that the defendant improperly admitted to the pool a girl 9 years of age without assigning a guard to her, failure to discover that she had drowned until twenty minutes or more had elapsed, failure to promptly search for her after discovering that she was missing and failure to have a suf-

ficient number of well trained guards on duty. The Court found that none of these charges was sustained by the evidence. The only proof of inattention of the lifeguards was their failure to observe anyone struggling in the water. There was no direct proof of inattention, as in this case, and there was no claim that the water was discolored.

In the Nebraska case of Lyman v. Hall there was no charge of inattention on the part of lifeguards or murky water. A verdict was directed as to charges unlike those here involved.

Likewise, in the other Nebraska case of Nolan v. Y.M.C.A. there was no evidence that the lifeguards were derelict in their duty. The similarity between that case and this is that it was charged in that case that the water in the pool was more cloudy than usual due to the introduction of chlorine. However, in that case it is apparent that a much longer time elapsed between the time the boy went under and his discovery and removal from the pool. The Court said:

"There is no proof that owing to the condition of the water and the lights, the body of a person could not be seen sinking beneath the surface of the water, nor that it would hinder rescue before he was extinct."

In all of the foregoing cases under the peculiar facts of each a verdict for defendants was directed.

In Langheim v. Denison Fire Department Swimming Pool Association, supra, 237 Iowa 386, 21 N.W.(2d) 295; Mock v. Natchez Garden Club, supra, 230 Miss. 377, 92 So. 562, and Perkins Admr. v. Byrnes, 364 Mo. 849, 269 S.W.(2d) 52, 48 A.L.R.2d 97, the action of the trial court in directing a verdict for the operator of the pool was

reversed and the cause remanded for trial. The interested reader is referred to these cases. It is sufficient to say here that we believe they fully sustain the action of the trial court in submitting the case at bar to the jury.

Affirmed.

Cooper and Parrott, JJ., concur.